EX PARTE CONWAY C. CRAIG.
EX PARTE BOB MCCRACKEN.
EX PARTE TOM MULVANEY.

Delivered February 13, 1946.
Rehearing Denied April 3, 1946.
Petition for Writ of Certiorari Granted by United States Supreme
Court October, 2, 1946.
Mandate of the United States Supreme Court Filed June 28, 1947.
Order of Court of Criminal Appeals, Discharging Relators in Obedience to the
Decision of the Supreme Court of the United States, Filed October 15, 1947.

*Kleberg, Eckhardt, Mobley & Roberts* and *Marcellus G. Eckhardt,* all of Corpus Christi, and *Black, Graves & Stayton* and *Ireland Graves,* all of Austin, for relators.

*Grover Sellers,* Attorney General, of Texas, *Jerry D'Unger,* of Corpus Christi, and *Ernest S. Goens,* State's Attorney, of Austin, for the State.

DAVIDSON, Judge.

This is an original application to this Court for the writ of habeas corpus, by which realtors seek to be discharged from custody and imprisonment under a contempt judgment.

At all times hereinafter mentioned, "The Corpus Christi Caller" and "The Corpus Christi Times" were newspapers published respectively the morning and afternoon of each day except Sunday in the City of Corpus Christi, Nueces County, Texas. The two papers published each Sunday a combined edition known as "The Corpus Christi Caller-Times." Said newspapers were under the same ownership and management. Relator Conway C. Craig is the publisher and directing head thereof. Relator Bob McCracken is the managing editor and the writer of a column therein known as "The Crow's Nest". Relator Tom Mulvaney is a news writer and reporter therefor.

On August 9, 1945, after notice and hearing, the relators were each adjudged to be guilty of constructive contempt by the County Court of Nueces County, by reason of publications appearing in the above-named newspapers relative to a suit pending in said court and were condemned to confinement in jail for three days. Said judgments of contempt became final, from which no appeal is authorized.

Relators each applied to this Court for the writ of habeas corpus alleging in the main that the judgment was void and

unenforcible because it was in contravention of the due process and freedom of the press provisions of our State and Federal Constitutions. It was by reason of the particular condtions thus existing that we granted the writs.

It is made to affirmatively appear that if the contempt judgment is valid as to any one of the relators, it is valid as to all; and if invalid as to either, it is such as to all. For this reason the three cases have been here consolidated, and are disposed of together.

On May 25, 1945, the case of Jackson v. Mayes proceeded to trial in the County Court of Nueces County before a jury, with the Honorable Joe D. Browning, Judge of said Court, presiding.

The proceeding was one of forcible entry and detainer, whereby Jackson sought to regain possession of a business building in the City of Corpus Christi which, he c'aimed, Mayes was unlawfully detaining from him.

The pivotal issue in the case was whether Mayes' lease of the building had expired because of non-payment of rentals, as contracted. Mayes was a member of the armed forces of this country and his business was handled by Burchard, as agent. At the close of the testimony in the case, each party presented a motion for an instructed verdict. That of the plaintiff was granted, and Judge Browning instructed the jury to return a verdict for Jackson. The jury refused to follow Judge Browning's instruction but, to the contrary, attempted to return into court a verdict for Mayes. Judge Browning refused to accept such verdict and again instructed the jury to return a verdict for Jackson. The matter just referred to occurred Saturday evening, May 26, 1945. It was not until Sunday morning following that the jury, after having been admonished by counsel for Mayes, returned the verdict as instructed, and even then noted on the verdict that they had been coerced into so doing. Judgment was duly entered upon the verdict for Jackson.

On May 29, 1945, Mayes, through his counsel, filed a motion for a new trial, which was, on the 6th day of June, 1945, in all things overruled.

On June 4, 1945, after the rendition of the verdict and while Mayes' motion for new trial was pending, one Newt Wright, who, as an officer of the County Court of Nueces County, filed in said court, addressed to the judge thereof, a complaint in

writing by and through which he charged that the relators were guilty of constructive contempt of said court by reason of the publication by them of certain publications in the newspapers heretofore mentioned. The allegations of the complaint and the publications referred to therein are as follows, that:

"On the 26th day of May, 1945, in the Corpus Christi Caller, there was published a purported news story which included the statement that,

" 'Burchard further claimed that although he had not known of the option clause, when he learned of it he immediately proffered a check for $275.00 rental.'

"On the 27th day of May, 1945, in the Corpus Christi Caller-Times, there was written, published and circulated a purported news story of proceedings had that included the following statement:

" 'At 7 P. M. Browning, without listening to argument from counsel for either side on a plaintiff's motion presented by Dudley Tarlton for Jackson, and without giving the six-man jury opportunity to weigh the evidence, instructed the jury to find against Mayes. W. M. Lewright, Mayes' attorney, protested that the court's arbitrary action had ruled that Tarlton's "one-page motion" did not need supporting argument and citation of authorities.'

"On the 28th day of May, 1945, there was written, published and circulated in the Corpus Christi Caller an article which contained the following language:

" 'Browning accepted Tarlton's one-page motion, and without permitting argument or citation of authorities to support the motion, ruled that it be granted. The effect of this ruling was that Browning took the matter from the jury.'

"The said article also included the following speech made by Walter Lewright, of counsel for the defendants:

" 'However, I now advise you that under the law, Judge Browning has the right to compel you, even against the dictates of your conscience, to sign the verdict he has ordered.

" 'As a matter of fact, it is probable that he has the power to put you in jail until such time as you do sign it, and I rather imagine; from what has heretofore taken place in this trial, that unless you do sign the verdict, he will cause you to be put in jail.

" 'As I and my clients feel that you have done all in your power to register your protest and revulsion of feeling at the affect of this decision reached by Judge Browning; as you are helpless to do anything further; and as making you suffer by remaining locked up will not do us a bit of good, I suggest that you sign the verdict and return to your homes with a clear conscience of having done all that you could to protect the rights of the man whom I feel, and evidently you feel, has been done a gross injustice.

" 'While we have no appeal from the court's decision in this case, we do have the right again to appeal to his conscience by presenting a motion for new trial in this action—and which motion we will file and argue strenuously with the hope that in the meantime he will see the error committed and will rectify the same.

" 'There cannot be any doubt but that the action of you men in registering your protest against this decision, as you have done, will affect him. At least, I can only hope that it will. I sincerely thank you.'

"On the 30th day of May, 1945, in an article written by the aforesaid Bob McCracken, and published and circulated in the Corpus Christi Caller under the editorial masthead, the Crow's Nest, there was contained the following language:

" 'Browning's behavior and attitude has brought down the wrath of public opinion upon his head, properly so. Emotions have been aggravated. American people simply don't like the idea of such going on, especially when a man in the service of his country seems to be getting a raw deal.'

"And further:

" 'Then the plaintiff's counsel offered a motion for an instructed verdict for his client. It was granted immediately, without having him cite his authority or without giving the defendant's attorney a chance to argue against it.

" 'That was the travesty on justice, the judge's refusal to hear both sides. That's where a legal background would have served him in good stead. It is difficult to believe that any lawyer, even a hack, would have followed such high handed procedure in instructing a jury. It's no wonder that the jury balked and public opinion is outraged.

" 'The fact that a serviceman is involved lends drama to the event. But it could have happened to anyone, it can happen to

anyone, with a layman sitting as judge in a case where the fine points of law are involved. True, the idea that only lawyers are qualified to occupy most public offices has been run into the ground, and in most instances, a competent layman would be better qualified, but the county judge's office is an exception. He should be a competent attorney as well as a competent business-man.

"It's the tragedy in a case of this sort that the court where the controversial decision was handed down is the court of last resort. It's too bad that appeal can't be made to a district court and heard by a judge who is familiar with proper procedure and able to interpret and weigh motions and arguments by opposing counsel and to make his decisions accordingly.'

"And further:

" 'There is no way of knowing whether justice was done, because the first rule of justice, giving both sides an opportunity to be heard, was repudiated.'

"On the same 30th day of May, 1945, in the same issue of the Corpus Christi Caller, there appeared what purported to be a report of action taken by the Sailors and Soldiers Advisory Counsel of Corpus Christi, the said action reported to have been the passage of a resolution: 'labeling County Judge Joe D. Browning's order for a directed verdict against Mays a "gross miscarriage of justice".'

"The said article further states that:

" 'The council's resolution called on Browning to grant Mayes a new trial on the grounds that he had committed an error in instructing the jury to find for the plaintiff. The petition asked that Browning, upon granting the new trial, should disqualify himself to further sit as Judge in the case, and should permit the case to be retried before another judge and jury.'

"And further:

" 'The trial reached a climax Saturday night when Browning, on motion of Dudley Tarlton, Jackson's counsel, and without argument or citation of authorities, instructed the six-man County Court to find for Jackson. The jury twice refused, both times bringing in verdicts in favor of Mayes and against Jackson. Browning had the jury confined to the court house jury room all Saturday night. Sunday morning, when the court convened, the jury reported that it still had not signed the verdict in favor of Jackson. Browning announced that he would lock

the jury up until Monday morning. However, Walter M. Lewright advised the jurymen that they should not continue to "suffer" any longer, and should sign the verdict, since Browning had a legal right to force them to do so. The jury signed the verdict, but appended a statement asserting that they did so under pressure.'

"On the 31st day of May, 1945, there was written, published and circulated by the persons aforesaid in Corpus Christi Caller a purported news story, which said:

" 'Three local groups were reported to be preparing petitions requesting County Judge Joe D. Browning to grant Pvt. Joe L. Mayes a new trial in the Playboy Cafe ouster suit.

" One petition is reportedly being drawn by a parents teachers' group, another by a service mother's group, and the third is being drawn for independent circulation among parents of men in service.

"The new petitions are said to follow the general outline of a petition adopted by the Corpus Christi Soldier's and Sailors Advisory Council Tuesday night. This petition called on Browning to grant a new trial and upon doing so to disqualify himself and permit the trial to go on under another judge and jury. Action on the petitions is expected shortly.

" 'The council's petition, drawn up by five veteran's organizations with a membership of more than 1,000 followed by a few hours the filing of a motion for a new trial by Walter M. Lewright and LeGrand Woods, Mayes' counsel.'

"The article also contained the following language:

" 'It came to a climax Sunday when Browning Saturday night accepted without argument or citation of authority a motion by Dudley Tarlton, Jackson's lawyer, for an instructed verdict.'

"The same article said further:

" 'The jury was kept Saturday night in the courthouse. Sunday morning, following a threat by Browning to keep the jury together until they did sign, the jurymen signed the verdict, appending a statement that they did so against the dictates of their conscience.' "

Various reasons were assigned whereby it was claimed that the articles mentioned constituted contempt of court, none of which we discuss save and except that which charges that the articles when taken together and considered as a whole "were

calculated and intended to falsely present to the public the nature of the proceedings had and to compel a different result on the hearing of the motion for a new trial" and to "prejudice and influence the court in its ruling on the aforesaid motion for a new trial * * * and were made at a time and under circumstances calculated to affect the force of justice in said proceedings * * *."

Upon consideration of this complaint and on the same day of its filing, Judge Browning caused to be entered a judgment nisi in which he found that the relators had published the statements alleged and that said publications were continuous and calculated to bring about the evil, as charged, as a consequence of which the relators were adjudged to be in contempt of court, and the punishment of each was fixed at three days' confinement in jail. An order was incorporated therein, commanding relators to appear at a future date to show cause why the judgment nisi should not be made final. The procedure employed was authorized. 9 Tex. Jur., p. 623, sec. 37. No attack is here made thereon.

The judgment nisi, after a full hearing, was made final on August 9, 1945.

Upon that hearing, the relators each appeared and answered to the complaint, in which they asserted—among other things—that the publications relied upon were insufficient to warrant a judgment of contempt in that, when considered together and with all other publications relating to the same subject, they "present no clear and present danger" to the overthrow of judicial impartiality or the administration of impartial justice at the hands of a judge possessed of a mind of reasonable fortitude; that any judgment of contempt or summary punishment imposed by reason thereof would be in contravention of freedom of the press and speech as guaranteed by Art. 1, sec. 8, of the Constitution of Texas, and a denial of due process as guaranteed by our Federal and State Constitutions.

There was also a denial of any intent to reflect upon, prejudice, scandalize, or bring into disrepute, the court.

In addition to the answer, relator McCracken presented to the court the following statement, viz.:

"Your Honor, we have had a conference, the three of us, and we have prepared this statement, or rather I have prepared it, and I would like to read it. (Reads)

" 'I can speak only for myself. Without knowing the meaning of purging a contempt, especially in a case of this kind, and not being guilty of any contempt as I concede, I can only say this:

" 'I think that the impression created upon the mind of the public by all that was said in our papers about the Jackson-Mayes trial was the same impression that would have been created upon the mind of an average intelligent layman who sat through the trial.

" 'It was the same impression that would have been created if the entire proceedings could have been published. In saying this, I do not impute unworthy motives to anyone; I do not undertake to judge motives.

" 'Moreover, I do not profess to know or presume to advise how the case should have been finally decided.

" 'It was my hope that the Crow's Nest published in the papers would quicken the conscience of the judge. I wanted him to search his conscience. It was my hope that what I said would make him more careful in discharging his duty. I think my column was calculated to have that effect upon a conscientious judge.

" 'As I saw it then, and as I see it now, the statements in the papers could not have the effect of overthrowing the will or undermining the conscience of the judge. They could have no such effect upon any judge worthy of the name. I assume that the judge would understand that he, and he alone, would have to decide the law as he understood it.

" 'I would not bring our courts into disrepute. Indeed, in the long run, their standing before the bar of public opinion is determined by the courts - - and by them alone - - but I would do what I can to help them always to perform their high and solemn duties.

" 'If, in this instance, I have gone about it in a way that has needlessly wounded sensibilities, I am sorry for that, but I do not concede that anything that I have done gives your honor license to punish me for it.' "

Relators Craig and Mulvaney each concurred in and adopted McCracken's statement.

The statement reflects the intent and mind of the publishers. It speaks for itself. Neither the answer nor statement of relators charge, impute, or suggest any unworthy motive on the part of

Judge Browning prompting him in his decision or action. It is insisted that when the editorials and newspaper articles are considered together, it was the purpose and intent thereof to force Judge Browning to grant Mayes a new trial in the case. In support thereof, attention is called to the fact that on Monday, May 28, 1945—the next day after the jury had returned the verdict in accordance with the instruction—the speech of Mayes' counsel was published, in which counsel stated that a motion for a new trial would be filed and argued strenuously "with the hope that in the meantime he (Judge Browning) will see the error committed and will rectify the same."

The motion for new trial was filed the next day, May 29, 1945. Then on May 30, 1945, an editorial appeared wherein Judge Browning's action in instructing the verdict for Jackson and against Mayes, without hearing "both sides", was criticized as being a "travesty on justice" and "high handed"; as having properly brought "public opinion down on his head"; as having "outraged public opinion"; as being "a tragedy" that the case could not be appealed to another court and tried before a judge who was "able to interpret and weigh motions and arguments by opposing counsel and to make his decisions accordingly"; and as being a consequent repudiation of the "first rule of justice." The editorial further stated that "there is no way of knowing whether justice was done."

On the same day, in the same issue of the paper where the above editorial appeared, and in connection therewith, there was published the account of the adoption of a resolution by the Sailors' and Soldiers' Advisory Council of Corpus Christi, which labeled Judge Browning's action in instructing the verdict for Jackson as a "gross miscarriage of justice" and which resolution called upon Judge Browning to grant a new trial and to disqualify himself to further sit as a judge in the case "and to permit the case to be retried by another judge and jury."

The next day, or May 31, 1945, a news item was published, calling attention to the fact that three local groups were reported preparing petitions asking Judge Browning to grant the motion for new trial and then to disqualify himself so another judge might try the case.

Do such publications authorize the contempt judgment?

We have no statute in this State defining as contempt the facts alleged in the complaint. Our courts are relegated, then,

to their inherent power—or power at common law—to punish for such alleged contempt. The rule controlling in Texas has long been that "the publication of matter having reference to a pending suit, which is defamatory and calculated in its nature to obstruct and impede the administration of justice and to embarrass the judge in the trial of the pending action, constitutes contempt of court." 9 Tex. Jur., p. 584, sec. 4; Ex Parte West, 60 Tex. Cr. R. 485, 132 S. W. 339; Ex Parte Green, 46 Tex. Cr. R. 576, 81 S. W. 723.

In Ex Parte West, supra, we said:

"* * * If the court be scandalized, its motives or integrity impugned in regard to official conduct, the consequences cannot but be baneful, the administration of the law embarrassed and impeded, the rights of parties endangered, and a calm and dispassionate discussion and investigation of causes prevented."

The rule stated is what is known as the "reasonably calculated rule", which is that publications made during and having reference to a pending suit which are reasonably calculated to obstruct the due and orderly administration of justice in that case constitute constructive contempt of court. The same rule is recognized in other jurisdictions under what is known as the "inherent tendency" and "reasonable tendency" rule. See 6, R. C. L., p. 508-9, Secs. 20 and 21; 12 Am. Jur., p. 412, Sec. 31; 17 C. J. S., p. 41, Sec. 30. See also Toledo Newspaper Co. v. United States, 247 U. S. 402, 62 L. Ed. 1186, 38 S. Ct. 560.

The right of the press to bring to public notice the acts, and decisions of judges and courts and to comment freely and fairly thereon is not only its privilege but duty. There is nothing sacred about the courts or the judge thereof. They are open to criticism for their acts, as are all other officials. Such is the right guaranteed by our State and Federal Constitutions of freedom of the press and speech. But when newspaper publications are made during the pending of a case in court and reach the point of interfering with the due administration of justice in the courts of this State, they cease to be protected by those constitutional guarantees. Liberty of the press and freedom of expression must not be confused with license or abuse of that liberty.

As sustaining the views just expresesed, we call attention to the case of Craig v. Hecht, 263 U. S. 255, 44 S. Ct. 103, 68 L. Ed. 293, wherein Chief Justice Taft said:

"It is of primary importance that the right freely to comment on and criticize the action, opinions, and judgments of courts and judges should be preserved inviolate; but it is also essential that courts and judges should not be impeded in the conduct of judicial business by publications having the direct tendency and effect of obstructing the enforcement of their orders and judgment or of impairing the justice and impartiality of verdicts.

"If the publication criticizes the judge or court after the matter with which the criticism has to do has been finally adjudicated and the proceedings are ended, so that the carrying out of the court's judgment cannot be thereby obstructed, the publication is not contempt and cannot be summarily punished by the court, however, false, malicious or unjust it may be. The remedy of the judge as an individual is by action or prosecution for libel. If, however, the publication is intended and calculated to obstruct and embarrass the court in a pending proceeding in the matter of the rendition of an impartial verdict, or in carrying out its orders and judgment, the court may, and it is its duty to, protect the administration of justice by punishment of the offender for contempt."

Freedom of the press is one thing. The due administration of justice in the courts is another. We have no difficulty in arriving at the conclusion that, as between the two, liberty of the press is and must be subservient and inferior to that of due administration of justice in the courts. Such conclusion is made manifest by reason of the fact that it is only through the courts that protection and enjoyment of the liberties guaranteed under our Bill of Rights can be made safe and secure. It is the courts that protect one in the enjoyment of liberties guaranteed under our Constitution.

It becomes material to know the meaning of "due administration of justice", as applied to the instant case.

The County Court of Nueces County is a court of record, made so by Art. 5, sec. 15, Texas Constitution. This section also prescribes the legal qualifications of the judge as "one well informed in the law of the State." The Legislature not having attempted by statute to make more specific the meaning of that phrase, it follows that a county judge is not required to be one licensed to practice law in this State. So, under our Constitution, the people, in electing one to the office of county judge, determine his right to hold that high office.

It is also the law in this State that in a forcible entry and detainer case, the judgment of the county court is final. No appeal is allowed. Art. 3992, R. C. S. The constitutionality of that statute has been affirmed by the Supreme Court of this State. Beacon Lumber Co. v. Brown, 14 S. W. (2d) 1022. The right of appeal is not a prerequisite to due process, as guaranteed by our Constitutions. Luckenbach v. U. S., 272 U. S. 533, 71 L. Ed. 394.

It follows, then, that the County Court of Nueces County had jurisdiction of the forcible entry and detainer suit. Judge Browning was the judge thereof whose duty it was to preside in the trial of that case and to determine the questions of law arising in that controversy.

If, in the performance of that duty, Judge Browning reached the conclusion—based soleley upon his understanding and interpretation of the law—that the jury should be instructed to return a verdict for Jackson, it was his clear duty to do so. In so doing, his judgment was the due administration of justice, under the Constitution and laws of this State, in that case. The correctness of Judge Browning's decision, under such circumstances and limitations, was not subject to review by any other court.

Relators do not challenge the finality of the judgment in the forcible entry and detainer suit but press upon us, as they did in the contempt hearing, that it was a good and sufficient defense to the accusation of contempt to show that Judge Browning's action in instructing the jury as he did was neither warranted nor authorized under the law or facts in that case but was against both the law and the facts. In other words, relators say that, as a defense to the contempt charge, they were authorized to show and sustain the truth of their publications—that is, that justice had not thereby been done. In support of that defensive theory, they bring before this court a statement of the facts adduced upon the trial of the forcible entry and detainer case. As authorizing such defense, relators cite the case of Ex Parte Green, supra, wherein is found the statement, viz.:

"As stated above, we gather from the current of authorities, both those cited and others, that there can be no constructive contempts of court with reference to publications reflecting on the court or the judge thereof, unless the publication is not only of a defamatory character, but is untrue, and, in addition thereto, relates to some particular case then pending, and is cal-

culated to embarrass the court in the trial or dispostion thereof."

The contempt relied upon in the Green case, supra, did not relate to a case pending in court. This distinguishes that case from the instant case. It cannot be said, then, that the Green case, supra, furnishes a precedent for our guidance here. To the contrary, the controlling rule to be applied in cases of contempt alleged to have been committed by publication during the pendency of a case in court and relating thereto, is that it is no defense that the publications were true.

Such conclusion is supported, directly, by the case of Patterson v. Colorado, 205 U. S. 454, 51 L. Ed. 879, 27 S. Ct. 556, wherein Justice Holmes said:          ,

"A publication likely to reach the eyes of a jury, declaring a witness in a pending cause a perjurer, would be none the less a contempt that it was true. It would tend to obstruct the administration of justice because even a correct conclusion is not to be reached or helped in that way, if our system of trials is to be maintained. The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and arguments in open court, and not by outside influence, whether of private talk or public print."

See also 6 R. C. L., p. 508, sec. 20, wherein the rule is announced to be:

"* * * The truthfulness of an article published during judicial proceedings constitutes no excuse, and does not relieve the author thereof from liability for contempt, when the article tends to impede, embarrass, or obstruct the administration of justice."

In addition to the authorities there cited, see Dale v. State, 150 N. E. 781, 49 A. L. R. 647.

Perhaps a more conclusive reason why relators were not entitled to show as a defense that Judge Browning's decision was incorrect lies in the fact that no appeal was authorized therefrom in order that some other court might review his action. If we were to allow that defense here, we would review that ruling in direct opposition to the statute. The issue before us is not whether Judge Browning's ruling was correct or incorrect, but whether the publications relating thereto were reasonably calculated to interfere with the due administration of justice in that case.

It is contended by relators that the Fourteenth Amendment to the Federal Constitution applies to the States the same standards relative to freedom of press and speech as under the First Amendment are applicable to the Federal government; that, by reason thereof, the Supreme Court of the United States has jurisdiction to review contempt judgments of State courts; also that in such cases and in determining the validity of such judgments, the Supreme Court of the United States has announced as the controlling one a rule more stringent against the judgment of the State court and more favorable to the constitutional guarantee of freedom of the press, than that recognized by this court.

It is insisted that the case of Bridges v. California, 314 U. S. 252, 86 L. Ed. 192, 62 S. Ct. 190, so holds and that this case should be decided by us upon the basis of that decision and the rules announced therein. That case, as here, was a test of the validity of common law judgments of contempt by a State court, claimed to be in violation of due process.

There is no question but that, as contended by relators under the Bridges case, following that of Gitlow v. New York, 268 U. S. 652, 69 L. Ed. 1138, 45 S. Ct. 625, the Supreme Court has taken jurisdiction of cases of this character and has repudiated, as being insufficient, the "reasonably calculated", "inherent tendency", and "reasonable tendency" rules heretofore mentioned, and announces the correct rule to be that known as the "clear and present danger" where the substantive evil is "extremely serious" and the degree of "imminence extremely high."

It becomes necessary, then, to analyze the holding in the Bridges case, and if applicable and controlling, to follow it.

As is usually the case when the Supreme Court reviews judgments of State courts alleged to be in contravention of the guarantees of the Fourteenth Amendment, the Bridges case turned upon the facts of that particular case, as determined by the Supreme Court from its independent examination. That case, then, is a precedent only in cases involving similar fact situations.

The Bridges case was a consolidation of two cases—one involving editorials appearing in "The Los Angeles Times" and the other, a publication in the form of a telegram by Bridges.

See Times-Mirror Co. v. Superior Court, 15 Cal. (2d) 109, 98 P. (2d) 1029; and Bridges v. Superior Court, 14 Cal. (2d) 488, 94 P.(2d) 983.

In the Times-Mirror case involving newspaper publications, three editorials were relied upon and formed the basis of the judgment of contempt. These editorials had reference to a criminal case pending in the courts of the State of California. Two of these editorials were published after a conviction had resulted in the case and before sentence had been passed by the trial judge. The third was published while there was pending the application of two of the defendants for probation under the conviction. The telegram publication was made while a motion for new trial was pending in a civil case—an injunction proceeding. The judgment of contempt in each of the cases was affirmed by the Supreme Court of California, upon the application of the rule of "inherent tendency" and "reasonable tendency" of interference with the orderly and due administration of justice in a pending case. See Times-Mirror Co. v. Superior Court, supra, and Bridges v. Superior Court, supra.

In the Times-Mirror case, only the editorial having reference to the application for probation was given definite consideration by the Supreme Court of the United States. It is copied below: [1]

The part of the editorial which reads: *"Judge A. A. Scott will make a serious mistake if he grants probation to Matthew*

---

[1] 86 L. Ed., p. 208:

"The whole editorial, published in The Los Angeles Times of May 5, 1938, was as follows:

"Two members of Dave Beck's wrecking crew, entertainment committee, goon squad or gorillas, having been convicted in Superior Court of assaulting nonunion truck drivers, have asked for probation. Presumably they will say they are "first offenders", or plead that they were merely indulging a playful exuberance when, with slingshots, they fired steel missiles at men whose only offense was wishing to work for a living without paying tribute to the erstwhile boss of Seattle.

" 'Sluggers for pay, like murderers for profit, are in a slightly different category from ordinary criminals. Men who commit mayhem for wages are not merely violators of the peace and dignity of the State; they are also conspirators against it. The man who burgles because his children are hungry may have some claim on public sympathy. He whose crime is one of impulse may be entitled to lenity. But he who hires out his muscles for the creation of disorder and in aid of a racket is a deliberate foe of organized society and should be penalized accordingly.

" 'It will teach no lesson to other thugs to put these men on good behavior for a limited time. Their "duty" would simply be taken over by others like them. If Beck's thugs, however, are made to realize that they face San Quentin when they are caught, it will tend to make their disreputable occupation unpopular. Judge A. A. Scott will make a serious mistake if he grants probation to Matthew Shannon and Keeran Holmes. This community needs the example of their assignment to the jute mill.' "

*Shannon and Kennan Holmes. This community needs the example of their assignment to the jute mill"*, had direct reference to a matter then pending before the judge for his decision and suggested the disposition that should be made thereof.

In holding the editorial and the particular part quoted above to be insufficient to support the judgment of contempt, the Supreme Court said:

"From the indications in the record of the position taken by the Los Angeles Times on labor controversies in the past, there could have been little doubt of its attitude toward the probation of Shannon and Holmes. In view of the paper's long-continued militancy in this field, it is inconceivable that any judge in Los Angeles would expect anything but adverse criticism from it in the event probation were granted. Yet such criticism after final disposition of the proceedings would clearly have been privileged. Hence, this editorial, given the most intimidating construction it will bear, did no more than threaten future adverse criticism which was reasonably to be expected anyway in the event of a lenient disposition of the pending case. To regard it, therefore, as in itself of substantial influence upon the course of justice would be to impute to judges a lack of firmness, wisdom, or honor, which we cannot accept as a major premise."

We construe this holding in the Bridges case to announce the rule that a newspaper editorial which does nothing more than threaten adverse criticism of a judge, should he act favorably on a pending application for probation by one under conviction for crime, will not authorize a common-law judgment of contempt against the publisher of that editorial where such adverse criticism of the publisher, because of his long-continued and well-known adverse attitude toward the controversy out of which the conviction resulted, was reasonably to be expected by the judge.

We pass now to a consideration of the telegram which Bridges published. It is copied below: (²)

---

(²) 86 L. Ed., p. 210:

"The portions of the telegram publ'shed in newspapers of general circulation in San Francisco and Los Angeles on January 24 and 25, 1938, were as follows:

" 'This decision is outrageous considering L. L. A. has 15 members (in San Pedro) and the International Longshoremen-Warehousemen Union has 3,000. International Longshoremen-Warehousemen Union has petitioned the labor board for certification to represent San Pedro longshoremen with International Longshoremen Association denied representation because it represents only 15 men. Board hearing held; decision now pending; Attempted enforcement of Schmidt

The publication was made pending a motion for new trial in an injunction controversy involving two labor unions. Bridges was directly connected with and interested in the union, against which judgment had been entered and which was sought to be set aside by the motion for new trial. The contempt judgment against Bridges was not based upon the use of the word "outrageous", in referring to the entry of the injunction, but upon that part of the telegram which threatened that a strike would be called if the injunction should be enforced. In other words, a strike was threatened unless the motion for new trial was granted. The Supreme Court of California affirmed the judgment, applying the "reasonable tendency" rule.

The conclusion by the Supreme Court of the United States that a publication of such threat was insufficient to support the contempt judgment was based upon the fact that the trial judge—from all the surrounding facts and circumstances—was necessarily charged with notice that a strike would probably result if he overruled the motion for new trial and, by reason thereof, the published threat added nothing to what he already knew and therefore could not have had any substantial influence upon his action.

From the Bridges case there emerges, then, the rule—as we understand it—that State courts are authorized, under their inherent or common-law power, to inflict summary punishment for contempt of court upon the publisher of newspaper articles and editorials concerning and relating to a case then pending before the court, only when the language of the publication is used under such circumstances and conditions and are of such a nature as to create a clear and present danger that the due and orderly administration of justice in that case will be obstructed. The likelihood of bringing about that evil must be extremely serious and the degree of imminence extremely high—the question of that likelihood being one of proximity and degree.

It follows that the "reasonably calculated" rule recognized by this Court appears not to be sufficient under the Bridges case. The Bridges case differs primarily from the instant case in the fact that there the question of whether the publications were contemptuous turned upon the fact that they carried threats of

decision will tie-up port of Los Angeles and involve entire Pacific Coast. International Longshoremen-Warehouse Union, representing over 11,000 of the 12,000 longshoremen on the Pacific Coast, does not intend to allow state courts to override the majority vote of members in choosing its officers and representatives and to override the National Labor Relations Board.' "

future adverse criticism and action on the part of the publishers in the event the disposition made in the case was not in keeping with the views of the publisher, and which threat of adverse criticism and action was reasonably to be expected by the judge because of the long-continued and well-known attitude of the publishers toward the matter then pending before the court for determination.

No threats are involved in the instant publications. The case pending before the court was of consequence only to the litigants. The public, as such, had no interest in the outcome of that litigation. The publishers had no personal interest therein, nor was there any prior adverse feeling or attitude on their part toward Judge Browning or Jackson, the party prevailing under Judge Browning's ruling.

These fact elements distinguish the Bridges case, supra from the instant case and render it uncontrolling, here, on the facts. However, the rule of "clear and present danger," as announced in the Bridges case, supra, is controlling here. It is in the light of that rule, then, that we are ultimately to decide this case.

When the several publications in the instant case are considered together and in their chronological order of appearance, there is no escape from the conclusion that it was the purpose and intent of the publishers thereof to force, compel, and coerce Judge Browning to grant Mayes a new trial. The only reason or motive for so doing was because the publishers did not agree with Judge Browning's decision or conduct of the case. According to their viewpoint, Judge Browning was wrong and they took it upon themselves to make him change his decision. To accomplish that end, Judge Browning's action in instructing the jury, without hearing argument on the motion, was editorially denounced as a "travesty on justice" and "high handed"; as properly bringing "public opinion down on his head"; as outraging "public opinion"; as a "tragedy" that the case could not be appealed to another judge who was "able to interpret and weigh motions and arguments of opposing counsel and to make his decisions accordingly"; and as a repudiation of the "first rule of justice", as a consequence of which "there is no way of knowing whether justice was done."

Following, and in connection with, the editorials, news items were published showing that a certain group of citizens had passed a resolution denouncing the decision as a "gross mis-

carriage of justice." Other news items followed, showing that three different groups of citizens were petitioning or circulating petitions calling on Judge Browning to grant Mayes a new trial in the case and to "permit the case to be re-tried by another judge"—all to show that by reason of the attitude of the publishers toward Judge Browning's ruling and decision, as reflected in the editorials, public opinion had become aroused and was demanding that a new trial be granted in the case because, in agreement with the viewpoint of the publishers, Judge Browning's ruling was wrong.

It is hard to conceive how the public press could have been more forcibly or substantially used or applied to make, force, and compel a judge to change a ruling or decision in a case pending before him than was here done. The publications were not only reasonably calculated to accomplish that purpose but there was also a "clear and present danger" that they would and the likelihood that such result would follow was "extremely serious" and the degree of imminence extremely high."

Such conclusions are made manifest because the publications and their purpose were to impress upon Judge Browning (a) that unless he granted the motion for a new trial he would be subjected to suspicion as to his integrity and fairness and to odium and hatred in the public mind; (b) that the safe and secure course to avoid the criticism of the press and public opinion would be to grant the motion and disqualify himself from again presiding at the trial of the case; and (c) that if he overruled the motion for a new trial, there would be produced in the public mind such a disregard for the court over which he presided as to give rise to a purpose in practice to refuse to respect and obey any order, judgment, or decree which he might render in conflict with the views of the public press.

In their answer, as well as written statement, relators denied any intent to reflect upon, prejudice, scandalize, or bring the court into disrepute.

Whether the publications constituted contempt of court is to be determined by the content thereof and the circumstances under which they were published. Moreover, relators do not take the position that the publications were not intended to force Judge Browning to grant the new trial, wherein lay the charge of contempt of court. The language of the statement by relators, "It was my hope that what I said would make.him

more careful in discharging his duty", indicates that such was their intent and purpose and motive.

It must be remembered that the only duty devolving upon Judge Browning at the time of the publications was to pass upon the motion for new trial.

The fact that Judge Browning subsequently overruled the motion for new trial could not inure to the benefit of the relators. The success or failure of the attempt to influence a court in the disposition of a case pending before him is not the test of liability to a charge of contempt. 12 Am. Jur., p. 417, sec. 37.

When Jackson presented his suit in the County Court of Nueces County against Mayes, he was entitled to have the rights which he asserted therein determined in that court in accordance with the law and not public opinion, private talk, or public print.

Under our system of goverenment and applicable laws of this State, Judge Browning and he alone, was to determine the issues of law arising in the forcible entry and detainer case, which, when so determined by him, became the law of the case. If that system is to be changed, the Legislature must do it, not the courts.

From what has been said, the conclusion is expressed that the publications warranted Judge Browning in holding relators in contempt of court, under the decisions of this Court and of the Supreme Court of the United States.

The relief prayed for is denied, and relators are remanded to the custody of the arresting officer.

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by a majority of the Court.

F. L. HAWKINS, Presiding Judge, and
H. N. GRAVES, Judge (concurring).

BEAUCHAMP, Judge (dissenting).

The majority opinion is conspicuously clear, concise and conclusive. We have no difficulty in understanding the extent to which this holding goes. We agree that the judgment finds the parties guilty of "constructive contempt"; that upon filing of a complaint, and without hearing, a judgment nisi was entered

finding them guilty as charged in the complaint and directing them "to appear at a future date to show cause why the judgment nisi should not be made final." It is correct that "the judgment nisi, after a full hearing, was made final on August 9, 1945." We can not agree that this was a proper procedure. It is directly in conflict with the Supreme Court of our State as well as our own Court: Ex parte Ratliff, 3 S. W. (2d) 406; Ex parte Ireland, 38 Tex. 351; Ex parte Testard, 106 S. W. 319; Ex parte Lipscomb, 239 S. W. 1101; Ex parte Kilgore, 3 Tex. App. 247; Ex parte Foster, 71 S. W. 594; Ex parte Landry 144 S. W. 962; Ex parte Duncan, 182 S. W. 313; Ex parte O'Fiel, 246 S. W. 664; and many others.

Judge Greenwood, speaking for the Supreme Court of our State in Ex parte Ratliff, supra, considers a case in which Ratliff had come into court and made a false statement about having sold and transferred some notes prior to the entry of an order restraining him from doing so. The judge found the sworn answer which he had filed to be untrue and summarily entered his judgment of contempt. After an exhaustive discussion of the authorities pertinent to the question, the opinion says: "The judgment is a nullity under a long and unbroken line of decisions of both the Supreme Court and the Court of Criminal Appeals." As authority he cited the foregoing cases, all of which have been examined and considered by the writer. The opinion concludes: "The judgment of the district court is void because it undertakes to deprive relator of his property and liberty without due process of law, as guaranteed to him by section 19 of article 1 of the Bill of Rights in the Constitution of Texas, and by the Fifth Amendment to the Constitution of the United States."

We have also given attention to a quotation in respondent's brief from Ex parte Britton, 92 S. W. (2d) 224: "To justify a court in punishing for contempt, three things are necessary: (1) Jurisdiction of the subject-matter; (2) JURISDICTION OF THE PERSON; and (3) the authority of the court to render the particular judgment." (Emphasis added.)

How can it be said that Judge Browning had jurisdiction of the parties when he entered the judgment nisi in the present case when they were not in court, actually or constructively? When they did appear in answer to the notice they were only called upon to meet the issues which were raised by the notice; that is, to show cause why the judgment nisi should not be made permanent. In as much as the judgment nisi was void it could

not be the basis for a final judgment in the case. As authority for this expression we refer to Ex parte Pease, 57 S. W. (2d) at page 576. an opinion by Judge Latimore, from which we quote the following:

"We also observe that the order and judgment of the trial court entered on May 10th finding and adjudging applicant guilty of contempt for said publications, SAME BEING AT MOST BUT CONSTRUCTIVE CONTEMPT, and applicant not being present, and no notice ever having been served upon him to appear, would be ENTIRELY VOID and without authority as such judgment; also, that IF THE JUDGMENT THEN SO ENTERED WAS MADE THE BASIS FOR THE JUDGMENT LATER ENTERED on May 16th, in which reference is made to said judgment of May 10th, SAME WOULD ALSO BE WITHOUT AUTHORITY OF LAW." (Emphasis added.)

Apparently when the final order was entered respondent discovered the error in the procedure and attempted to avoid the difficulty by not specifically referring to the judgment nisi. The facts remains, however, that the judgment nisi was used as a basis for the order made after hearing; they contain the same subject-matter in the same language. The court could enter no other order under the notice. Brasher v. State, 112 So. 535.

Our courts, state and federal, with practically unanimity, have long accepted the definition of "due process of law" as formulated by Daniel Webster in his argument in the famous Dartmouth College case, quoted in the following language: "A law, which hears before it condemns; which proceeds upon inquiry and render judgment only after trial." We know of no criticism of this comprehensive definition. It has been applied, followed, and has determined the result of thousands of cases with a loyalty unknown to any other recorded argument of an attorney at the bar. Every clause in Webster's definition is violated by the court in the instant case when Browning entered judgment nisi. The parties were not present; they had not been heard; no inquiry was made of them; yet, they were condemned. The final order of the court does nothing more than attempt to make this judgment nisi final. The error in entering that judgment was fundamental, because the court was without jurisdiction to enter it. Thomas v. D. C. 90 F(2) 424; Barnes Drilling Co. v. Phillips, 26 P(2) 766; see. also Simpson v. Stanton, 193 S. E. 64, from which we quote: "Judgment without such citation and opportunity wants all the attributes of a judicial determination; it is judicial usurpation and oppression, and can never be upheld where justice is fairly administered."

Furthermore, I am unable to agree with my associates that the evidence introduced in this case would support a judgment for contempt under proper procedure. In determining this question I agree that consideration must be given to all of the publications about which complaint is made, but this cannot be done and understood without also considering the subject-matter of the publications and this has not been taken into account by the majority. If we accept the statement which is made as a basis for the conclusion reached, that "the rule controlling in Texas has long been that 'the publication of matter having reference to a pending suit, which is defamatory and calculated in its nature to obstruct and impede the administration of justice and to embarrass the judge in the trial of the pending action, constitutes contempt of court'," we are necessarily relegated to the procedure which took place in the county court in order to conclude the question as to whether or not the publications were intended to "obstruct and impede the administration of justice." If the judge had entered the wrong judgment and their efforts should be to induce him, not by fear but by reason of further consideration, to set aside a wrong judgment and enter one according to law and justice, could it then be said that they were intending to "obstruct and impede the administration of justice"? The opinion reaches that conclusion without any consideration of the correctness of the judgment in the ouster proceeding. I wish to consider the case in connection with that judgment. For that reason I find it necessary to give brief attention to the civil suit.

This suit, by Jackson, et al v. Mayes et al, resulted in judgment for plaintiffs in the justice court. After appeal the case came on for trial in the county court. The evidence and procedure there consumed the greater part of three days, though there was but one issue which forms the basis for the judgment and that was determined by a lease contract, in writing, together with undisputed evidence to the effect that after the expiration of the contract, on March 15, 1945, Mayes had an option to extend it for a year. The rent for the additional period was $275.00 a month instead of $250.00. The lease contained no specific provision for the exercise of this option, either as to the date or manner of giving notice of the lessee's intention to extend it. He simply had the option.

It is very clear that the evidence in the detainer suit will not support a forfeiture. The question is not controlled by statute in our State but it is well recognized that equity does not favor forfeitures and this is especially true of landlord and tenant

contracts. The landlord writes the contract. If he imposes conditions for the exercise of the option, such will be enforced. If, however, none are written in the contract, the courts may not interplace them.

Prior to the expiration date Mayes had gone into the Armed Service and left his business affairs with an agent, who was not advised of the provision for the increased rent. At the proper time he tendered a check, in the usual way, for $250.00. Later he gave a new check for the $275.00 but through error it was postdated April 15th instead of March 15th. On the 13th day of April this check was returned to him by the plaintiff's attorney. The failure to pay the rent in the sum of $275.00 by the 15th day of March was the basis for the claim to cancel the lease, and also for the instructed verdict in plaintiff's favor. Such instruction to the jury, in the manner set out in the original opinion, was contrary to law. There is no defense attempted to be made for this action in respondent's brief. All reference to it has been studiously avoided. It is not considered in this court's opinion. I am unable to see how we can reach the conclusion that relators were attempting to "influence the court in the pending case CONTRARY TO LAW AND JUSTICE," in view of that judgment which is contrary to well recognized rules of equity.

Another phase of the record which has not been considered is that the publications spoke the truth. General allegations are made that they became false by over-emphasis, placed in conspicuous positions in the newspapers, and unnecessarily repeated for the purpose of creating the wrong impression, but the record does not contain any evidence that would in the remotest degree deny the truthfulness of the news reports coming from the trial of the case. While it is pointed out that certain facts were not published, these facts had no bearing on the case on trial and the failure to publish them could not be construed as placing the proceedings in a wrong light before the public. The fact that there were other parties interested, whose names were not mentioned, and that they were prominent people, will not constitute contempt however unfair it may appear to the court, or to others named.

It is well recognized that the truth or falsity of publications may always be properly considered in fixing punishment. In many cases the truth or falsity is relied upon in determining intent—the very essence of crime. Intent is involved in the case now before us. I am of the opinion that the truth of the publications is the determining factor because there appears no de-

famatory, degrading or debasing language. There was no effort to obstruct, interrupt, prevent, or embarrass the administration of justice. At most it was a plea for a trial by one qualified to conduct the case according to the rules of justice. There was no reflection on the judge's integrity. All references to any irregularities are explained by the fact that he is not a lawyer.

We do not wish to be committed to the doctrine that proof of the truth of statements is always a complete defense to a charge of contempt in a case of this character. At the same time, we must recognize the general rule which has been stated by this court, to which we refer as follows, in Ex parte Green, 81 S. W. 723, at p. 725: "There can be no constructive contempts of court with reference to publications reflecting on the court or the judge thereof, unless the publication is not only of a defamatory character, but is untrue, and, in addition thereto, relates to some particular case then peneding and is calculated to embarrass the court in the trial or disposition thereof. As to other publications not relating to a pending case, no matter how defamatory the language used may be with reference to the court or the judge thereof, this will not constitute a contempt, because it cannot be regarded as calculated to interfere with the administration of justice."

Again from Ex parte Pease, supra: "It is still the rule in this state that one charged with contempt shall be allowed to prove the truth of his alleged contemptuous utterance. Ex parte O'Fiel, 93 Tex. Cr. R. 216, 246 S. W. 664. We think proof of the truth of the matter so published would have entitled applicant to his discharge upon the hearing before the court. We note the court refused to permit him to make such proof to which he took his proper bill of exception."

We find numerous decisions to the same effect from various jurisdictions. The truthfulness of the publications is certainly entitled to some consideration in any character of case.

The public has an interest in the proper and effective procedure of our courts. Every case, civil as well as criminal, carries with it a public interest. If the public has an interest it is entitled to know what is taking place. In the early part of the trial evidence was introduced, making sensational charges against the opposing party. Such charges related to liquor violations, gambling, etc., and had no part in determining the rights of the parties in the civil case. The court overruled objections

to this testimony and extended the time of the trial of the case (at the expense of the tax payers, always) to delve into these matters. It is natural to expect that such evidence would attract crowds to the court room and generate discussions on the streets. People would look to the newspapers for the true facts as to what occurred. Without such publications gossip will usually run wild. The names of good men might become involved. "Winds of doctrine should freely blow for the promotion of good and the correction of evil." The public was entitled to receive the true facts. If this weighed on the head of the judge he brought his own house down. It can not be laid to relators.

Finally, when the instructed verdict was given and the unusual procedure followed, wherein the jury refused to render the verdict as instructed, the public still had an interest. All of the machinery of the court, the building in which the trial was conducted, and the time consumed by the jurors, remain matters of public interest as being tax supported. The public may properly expect that all cases tried shall be conducted in an orderly manner, according to law, and that a just and legal judgment be finally entered. That is the purpose in providing courts at public expense to conduct private litigation.

Relators are members of society and in their capacity as gathers, commentators and publishers of the news, they have a responsibility to the general public. They exercised it in a fair and reasonable way, considering the subject-matter with which they had to deal and the public interest involved. Thus we find every element of contempt known to modern jurisprudence to be lacking in the record and resort is had to the old idea which invests royalty with imaginary perfection and forbids a discussion of any question concerning the judge's acts. He was the representative of the king and, as such, could do no wrong. It is important that the dignity of the court be maintained, but it is likewise important that the public interest be served. If that requires a discussion of the procedure in court, the public interest should be held superior. It is not so much a naked "freedom of the press" for which we are concerned as it is the public interest in the efficiency of our government.

The view we herein express has been ably treated in the case of Sullens v. State, 4 So. (2d) 356, by the Supreme Court of Mississippi. We quote from it as follows: "The exercise of this right may embarrass the particular functionary; it may depreciate the effectiveness of our legal procedure, yet so long as it pulls up short of the obstruction or impedance of the ma-

chinery of the court then in motion, it is free from interference by the court." The paragraph from which the foregoing is taken concludes: "One may criticize the court as inefficient so long as he does not contribute to its inefficiency."

The concluding paragraph of the opinion, in the Sullens case, says: "We are not unmindful of the extent to which the full exercise of the freedom of the press may on occasion tend to embarrass a trial judge in the discharge of one of the most difficult, exacting and important public duties. * * * The two writings here involved must be adjudged in the light both of their text and their context. When viewed in both aspects we do not discover in them the ingredients of constructive contempt."

Chief Justice Smith, of the Mississippi Supreme Court, wrote a concurring opinion from which we quote at length because of the pointedness of expression, as well as the unavailability of the report to the bench and bar of Texas.

"Since the adoption of our constitutional guaranties of freedom of speech and of the press, American newspapers in response to public demand therefor have assumed the duty of giving the people full information of the conduct of public officials, including the judges of all courts. Such information is necessary in a Democracy in order to insure the observance of its processes. 'Star Chamber proceedings or secrecy in the administration of justice is provocative of injustice any tyranny. The people have a right to know how its judicial, as well as executive officers, perform their duty, and publicity of the acts and doings of court officials serves as a material factor in keeping the stream of justice unpolluted.' Patternson's 'Free Speech and a Free Press,' p. 151. The discharge of this duty was here particularly incumbent upon the appellant, because of the threat made by the judge to jurors who had voted for an acquittal in a criminal case to cite them for contempt of court."

The Sullens case was decided in 1941. The first of the publications under discussion took place while the court was still in session and related to the conduct of the court in handling the grand jury and the trial of cases generally. Many of the indictments returned were pending when the other publications were made and it cannot be said that the publications related to matters that had already been closed. The facts of the case, particularly the editorials, are very similar in all material respects to the case before us.

I discovered, too, an overemphasis, if not a fanciful distinction, made between a case now pending and one which has been concluded. This appears, however, to be in keeping with many decisions. In my view the dignity of the court may be as much injured by a subsequent discussion of its action as if made during the court procedure. Such holdings constitute a recognition of our departure from the common law decisions as they came to us in the early day. If the public is entitled to know only after the case is concluded, particularly one from which there is no appeal as in the instant case, we are then like the man who locked the stable after the stock had been stolen from it. After the majority opinion in this case, it will be exceedingly dangerous for a newspaper to publish the court proceedings and, it appears to me, for the citizenry to discuss same until the whole matter is concluded. The public would thereby be precluded from informing themselves as to the capacity of the various officers to occupy the positions to which they have been elected. We would not have the best information obtainable in the re-election of our judges, clerks and bailiffs.

I have searched in vain to find a case, in this or any other jurisdiction, where a party has been held in contempt of court for publishing the truth; for attempting to induce the court to decide a case according to law; or for a judgment nisi which has been held valid in a case of constructive contempt. I have examined all of the cases cited by all parties, and most of those upon which such cases rely as well as many others. There is no parallel to this case to be found.

Finally, the opinion is in error in the conclusion that the finding of Craig guilty of contempt necessarily includes both of the others. Mulvaney was a news reporter and had no part or responsibility in the editorials or the manner of the publications after his story of each daily occurrence was reported to his superiors. If his part in the transaction should be contemptuous Craig would be responsible, as the publisher, but Mulvaney is not responsible for the things that McCracken and Craig did.

I acknowledge the high quality of the briefs by both sides of this controversy. They have been of unusual assistance in the very difficult questions treated.

I cannot believe that this opinion can stand as the law of this State, and respectfully record my dissent.

ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Relators have filed a motion for rehearing, and supporting printed argument as well as a strong oral argument.

Because of some differences of opinion among ourselves, and the importance of the question involved the case had our most patient and careful consideration on original submission. The motion for rehearing has caused us to re-examine the voluminous record. Our conclusions expressed in the majority opinion remain steadfast. Any effort to write further on the motion would result only in expressing the same views in different language with no benefit accruing to anyone.

We appreciate the work of the attorneys on both sides of the question as reflected by their briefs.

The motion for rehearing is overruled.

PER CURIAM:

HAWKINS, Presiding Judge.

In obedience to the decision of the Supreme Court of the United States, entered on May 19, 1947, reversing the decision of this court in this cause, it is ordered that relators be and are hereby discharged.