## JOHN JENKINS v. THE STATE.

No. 2529. Decided May 20, 1903.

### 1.—Murder—Evidence—Inquest, etc.

On a trial for murder, proceedings on an inquest, or to discover the murderer, under articles 941, 942, Code of Criminal Procedure, where the testimony of the witnesses is taken down, becomes a public document; and, on proper motion, defendant has the right to inspect it and use it as evidence if he deems it necessary.

### 2.—Same—Accomplice.

On a trial for murder, it is competent for the State to show the movements of an avowed accomplice in connection with the homicide, and up to and including the time of his arrest.

**3.—Same—Coconspirators.**

On a trial for murder the State is authorized to show the movements of the alleged conspirators before the homicide and during the morning of the homicide, both before and immediately after its commission.

**4.—Same—Charge.**

After the homicide, the acts and declarations of a conspirator would not bind his coconspirators; and, when admitted properly in evidence, the court should, in its charge, limit such testimony to the purposes of its admission.

**5.—Impeachment of Wife as a Witness.**

On a trial for murder, where the wife of one of the principals, in testifying for defendant on trial, disproved the alleged conspiracy by testifying to an alibi for her husband, it was competent for the State to impeach and contradict her, inasmuch as her alibi testimony was upon a material issue, where a proper predicate has, on her cross-examination, been laid for such impeachment.

**6.—Same.**

Where the wife of an alleged confederate to the murder had testified that when she left the home of deceased, at daylight, deceased was still in bed, it was competent to impeach her, as to this fact, by her contradictory statements to a witness.

**7.—Same.**

Where the wife of a coconspirator had testified that on the night before the killing she had seen the accomplice witness B. Q., whom she knew well, lurking about the deceased's house, it was competent to contradict and impeach her, as to this matter, by proof of her contradictory statements to the sheriff and others, the effort of defendant being to fasten the killing solely upon the said B. Q.

**8.—Same—Impeachment of Defendant as a Witness.**

A defendant, as a witness, can not be impeached by proof of his connection with thefts, where no charge of theft has ever been preferred against him.

**9.—Evidence—Footprints.**

It is always proper to show any peculiarity in footprints at the locus in quo, and show that defendant wore shoes corresponding with the peculiarities in said tracks.

**10.—Impeachment of Witness as to His Opinion.**

The statement of a witness as to his opinion that Mexicans committed the murder, not being legitimate evidence, because simply his opinion, was a matter upon which he could not be impeached.

**11.—Alibi—Charge.**

On a trial for murder, where the defense was an alibi, and that was an issue, the court should instruct the jury that, if they had a reasonable doubt of the presence of defendant at the scene of the homicide, either from the testimony or the want of testimony, to give the defendant the benefit of such doubt, and acquit him.

Appeal from the District Court of Bexar, on a change of venue from Atascosa County. Tried below before Hon. John H. Clark.

The appellant, Fred Jenkins, and Bee Qualls were each separately indicted by the grand jury of Atascosa County, Texas, for the murder of Mrs. Jane Barber, Wiley Barber and Levi Barber, on the 13th day of September, 1899, in Atascosa County, Texas.

B. Qualls turned State's evidence. Fred Jenkins was twice tried in Atascosa County, Texas, and twice convicted for the murder of Mrs. Jane Barber, the jury each time assessing the death penalty. After the judgment the lower court, the second time the case had been reversed by this court, of its own motion on October 2, 1900, changed the venue of all the cases to Wilson County, Texas. By the court in Wilson County, Texas, all of the cases against Fred Jenkins were dismissed.

At the December term, 1900, of the District Court of Wilson County, Texas, John Jenkins, the appellant, was tried for the murder of Mrs. Jane Barber. Said trial resulted in a mistrial, there being a hung jury. At the December term, 1901, a special venire was ordered and upon the appearance of the said venire the case was called and both sides announced ready, but failing to get a jury there was no trial, and the court, on December 20, 1901, of its own motion transferred the cases against appellant and Bee Qualls to the Thirty-seventh Judicial District Court of Bexar County, Texas. On June 9, 1902, the appellant, John Jenkins, was placed upon trial in this case for the murder of Mrs. Jane Barber in Atascosa County, Texas, on September 13, 1899. Said trial resulted in a conviction, the jury assessing the death penalty.

Deceased, Jane Barber, was the grandmother of defendant. Fred Jenkins, also indicted in another case for the murder, was the father of defendant, and his wife Bettie Jenkins was a daughter of the deceased, Jane Barber, and mother of defendant. Bee Qualls, who was a confessed accomplice and testified as a State's witness in the case, was a distant relative of the Barber family.

Qualls testified that Fred and John Jenkins, the defendant, had tried to get him to murder the Barbers, and proposed to pay him to do so, but that he declined the proposition. Subsequently he agreed to keep watch for them while they committed the deed. He testified that they went to the Barber home in accordance with their agreement. That Fred Jenkins killed old Mrs. Barber and her son Wiley, who was sick in the house, with an ax. That John Jenkins, before the others were killed, had taken Levi Barber out of the house to have a talk with him, and killed him. That after Fred Jenkins had killed the parties in the house, he came out in a few seconds with a sack of money in his hand and gave witness $50 of this money. They also promised to pay him $15 per month for looking after the cattle they would get from the Barber estate. The object of the conspiracy and the murder was to get possession of the Barber estate, which, upon the death of the parties killed, would be inherited by Mrs. Bettie Jenkins, wife of Fred Jenkins, who would be the next of kin surviving.

This general statement is sufficient. The questions discussed on this appeal are so fully stated in the opinion as to need no further illustration from the record.

*W. A. H. Miller, F. H. Burmeister,* and *John T. Bivens,* for appellant, filed an able and elaborate brief.

*Carlos Bee,* District Attorney, and *Howard Martin,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at death; hence this appeal.

The theory of the State is that appellant, in conjunction with his

father, Fred Jenkins, and one Bee Qualls, murdered Mrs. Jane Barber (for which he is indicted), and also the two sons, Wiley and Levi Barber, on September 13, 1899; that this was done in pursuance of a previously formed conspiracy between said parties, the motive being gain. The testimony showed that Mrs. Bettie Jenkins (wife of Fred Jenkins) was the only heir of the three persons who were killed; and that said persons were possessed of an estate of the value of $2500; that appellant and his father were poor, and their motive for the homicide was that they might succeed to the property of the deceased; that the services of Bee Qualls, who was also related to them, were secured by agreeing to divide the money which deceased might have, with him; and also to employ him to superintend and take care of a small bunch of cattle, belonging to deceased, which they expected to obtain. The State mainly relied on the evidence of Bee Qualls, who was an accomplice, and this is supported by circumstances proven by other witnesses. Appellant relied on the weakness of the State's case, and also introduced evidence tending to establish an alibi. This is a sufficient statement of the case in order to discuss the assignments of error.

Appellant made a motion to require the State to turn over to appellant or his counsel certain proceedings had before the justice of the peace and Judge Wallace, which occurred shortly after the homicide. The motion and bill do not make it clear whether this was inquest testimony or proceedings set on foot to discover the murderer under articles 941 and 942, Code of Criminal Procedure. If these proceedings were authorized by law and the testimony of the witnesses taken down, it was a public document, and appellant, on proper motion, had a right to inspect and use it if he deemed it necessary.

With regard to the assignments contained in appellant's second and third bills of exception, we hold that it was competent for the State to show the movements of the accomplice Bee Qualls in conection with the homicide and up to and including the time of his arrest. And the State was also authorized to show the movements of the alleged conspirators before the homicide and during the morning of the homicide, both before and immediately after its commission. Of course, after the homicide, the acts or declarations of one would not bind the others, and the court should limit such testimony.

And in this connection it was permissible for the State to prove by Mrs. Bettie Jenkins, the wife of Fred Jenkins, in her cross-examination, statements contradictory to the evidence given by her in her examination in chief. She testified on behalf of appellant as to an alibi in favor of her husband, thus disproving the conspiracy so far as he was concerned. And it was competent on the part of the State to show, if it could, on her cross-examination, that she had made statements to others in conflict with her testimony as to the alibi of her husband; and if she denied the fact, and also denied making such statements, it was competent to contradict her, inasmuch as her alibi testimony was upon a material issue.

We also hold that it was competent to impeach Mrs. Jenkins (wife of

Fred Jenkins) by proving that she had stated to witness Mrs. Burroughs that when she left the Barber home, Mrs. Jane Barber was then up and said she was going to kill a chicken and make some broth for Wiley Barber. Mrs. Jenkins had been introduced as a witness for appellant, and her testimony tended strongly to show that, so far as her husband, Fred Jenkins, was concerned, he could not have been in a conspiracy to kill the Barber family. And in addition, she testified on behalf of defendant, that when she left the Barber home, about daylight, Mrs. Jane Barber was still in bed. This evidence was evidently deemed by appellant to be material, and upon this point it was admissible to prove by her a different state of facts with reference to Mrs. Jane Barber; or if she denied such condition, it was competent to lay the predicate to contradict her upon this issue.

What we have said above also applies to this witness and to the witness Conley Jenkins, with reference to the statement to the sheriff and others that the person she saw around the Barber house the night before the killing was black as a negro, and she could identify him. She had testified on behalf of appellant that the person she saw there was Bee Qualls, whom she knew well, and he was not dárk complexioned; and it was proper for the State to show by her, if it could, that she had made a different statement as to the person that she saw there, and if she denied this, to permit her impeachment, which was done. We gather from the bills of exception, as well as from the conduct of the case, that on the trial it was the endeavor of appellant to fasten the killing solely on Bee Qualls. It appears that some time subsequent to the homicide, and after Qualls' arrest, he turned State's evidence, and testified to a joint conspiracy between the two Jenkinses and himself to commit the murder. To rebut this theory, and to fix the homicide solely upon Bee Qualls, Fren Jenkins, and his wife, Bettie Jenkins, and also Conley Jenkins, testified to facts exculpating Fred Jenkins and John Jenkins, but fixing and tending to show that Bee Qualls alone was guilty of the homicide. And in this connection Mrs. Jenkins and Conley Jenkins testified to seeing Bee Qualls lurking around the Barber premises, during the night previous to the homicide, and endeavoring to break into the storeroom. In rebuttal of this testimony the State was authorized to show by Mrs. Jenkins and Conley, if it could, that it was not Bee Qualls, but some one else as black as a negro that they saw there that night; or if they denied this, the State was authorized to lay a predicate and impeach them upon this issue. As we understand it, this was done.

We do not think the court erred as presented in bill of exceptions number 9. The bill does not show that appellant was ever charged with the offense of theft of chewing gum or tobacco in any proceeding. Before a witness can be impeached by this character of evidence, there must be some sort of charge preferred. Carroll v. State, 32 Texas Crim. Rep., 431; Britain v State, 36 Texas Crim. Rep., 406.

There was no error as presented in bill of exceptions number 15. It

is always proper to show any peculiarity in foot prints—as in this case—
to show that the impression of the track found on the ground appeared as
if the counter of the shoe projected over the heel, and then to show that
appellant wore a shoe corresponding with the track of that character.
We understand that the court excluded the evidence of the measurement
of the track, inasmuch as the measurements appear to have been lost.

It appears that while Fred Jenkins was on the stand the State was
permitted, on cross-examination, to ask him, if he did not, on Sunday
evening after the killing, tell Sheriff Avant that he (Fred Jenkins)
thought or believed that some Mexicans working for Vincente Agurea
had committed the murder. To which question defendant objected,
because the same was a declaration of a coconspirator after the consum-
mation of the conspiracy. The district attorney informed the court
that he was laying a predicate to impeach the witness Fred Jenkins.
Thereupon the court overruled the objection of defendant, and in reply
to the question, the witnesses answered, "No, he did not tell Sheriff Avant
as stated." Appellant objected to this testimony because it was an at-
tempt to lay a predicate to impeach the witness Fred Jenkins on an
immaterial matter, and because said testimony brought before the jury
the opinion of said witness; that the testimony would not afford a predi-
cate for contradiction. In this connection the court refers to bill number
6 (which is really in the record). This bill shows that Sheriff Avant
was placed on the stand by the State, and, on examination by the State,
he stated that Fred Jenkins told him that he thought, or believed, Mex-
icans working for Vincente Agurea had committed the murder. This
testimony was objected to because it was the opinion of the witness, and
the declaration of an alleged coconspirator after the commission of the
offense for which the conspiracy was formed, and could not bind or affect
defendant, he not being present; and that it was the impeachment of
the witness Fred Jenkins upon an immaterial matter. The court over-
ruled this objection and permitted the testimony, qualifying the bill of
exceptions, as follows: "Fred Jenkins was one of the alleged conspira-
tors and principals, according to the testimony of Bee Qualls, who was a
confessed conspirator and principal in the commission of the offense, and
who was a witness for the State. Mrs. Bettie Jenkins, the wife of Fred
Jenkins, had testified, being a witness for the defense, that she had seen
the said Bee Qualls just outside the Barber yard where the offense was
committed, on the evening before the murder, about dusk, and again
later in the night, and that she had told her husband of this on the
morning of the murder, and before they had heard of the murder. And
the witness Fred Jenkins admitted on the stand that he had been so
informed by his wife on the morning of the murder, and said it was
before he knew anything of it; and the jury were told by the court at
the time said testimony was admitted that it could only be considered
by them upon the question of the credibility of Fred Jenkins as a wit-
ness." If this impeaching testimony was upon an immaterial matter,
it could not afford the basis of an impeachment. Or if it was upon a

material matter, and the mere statement of an opinion when an opinion is not legitimate evidence, it would not be admissible. Drake v. State, 29 Texas Crim. App., 276; Gill v. State, 36 Texas Crim. Rep., 596. As explained by the learned judge, the testimony was evidently upon a material issue. That is, according to the State's theory, Bee Qualls, in conjunction with Fred and John Jenkins, were the murderers of the Barber family. Appellant insisted that Bee Qualls alone committed the murder; and in pursuance of this latter theory, Bettie Jenkins testified to facts suggesting that Bee Qualls alone must have done the murder. While it was competent to contradict her as to what she might have stated, as to who she saw at the Barber place on the night of the homicide, and it appears from another bill of exceptions that this was done, still it was not competent to lay the predicate by Fred Jenkins as to what he might have said as to his *belief* that Mexicans may have committed the murder, although his opinion or belief may have been founded in part from what his wife told him. His *opinion* or *belief* as to whether it was Mexicans who may have committed the homicide was not legitimate evidence, and being inadmissible he could not be impeached upon this issue. See Wiliford v. State, 36 Texas Crim. Rep., 414. The effect of the impeachment was to discredit the witness Fred Jenkins as to other matters about which he testified, that were material on behalf of appellant, and accordingly was hurtful to him.

Appellant assigns a number of errors to the charge of the court. We believe that the court properly charged with reference to accomplice testimony, and how it should be corroborated; and also the charge with reference to limiting certain testimony going to the credit of witnesses, was in accordance with the authorities, and it was not necessary to give the requested instructions upon these subjects. However, with reference to the charge on limitations of testimony, perhaps on another trial the court should make the charge plainer, so that the jury may have no difficulty in understanding it. And on the subject of alibi it might be well to tell the jury, if they had a reasonable doubt of the presence of appellant at the scene of the homicide, either from the testimony or the want of testimony, to give defendant the benefit of such reasonable doubt and acquit him. With reference to Fred Jenkins' alibi, it was not necessary for the court to instruct the jury at all. It was possible the jury might have believed appellant was present and they might not have believed that Fred Jenkins was present.

Appellant also strenuously insists that the evidence is insufficient to sustain the verdict and judgment, contending that the accomplice is not sufficiently corroborated by testimony of an inculpatory character tending to connect appellant with the commission of the offense. In view of another trial, we do not deem it necessary or proper to analyze the evidence or show its bearing on the testimony of the accomplice. We would observe, however, that it occurs to us that the accomplice is sufficiently corroborated. Lockland v. State, ante, p. 87, and authorities there cited.

For the error in permitting the impeachment of the witness Fred Jenkins, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

[The State's motion for rehearing was overruled without a written opinion.—Reporter.]