**HOUSTON CHRONICLE PUBLISHING COMPANY and Jim B. Barlow and the Houston Post Company, Relators,**

v.

**Douglas SHAVER, Judge, Respondent.**

**No. 68904.**

Court of Criminal Appeals of Texas, En Banc.

March 17, 1982.

Charles H. Waters, Jr., Houston, for Chronicle.

James E. Crowther, Richard A. Sheehy, Houston, for Post.

John B. Holmes, Jr., Dist. Atty., Winston E. Cochran, Jr., Asst. Dist. Atty., Houston, Robert Huttash, State's Atty., Austin, for respondent.

OPINION

CLINTON, Judge.

In this extraordinary proceeding the original jurisdiction of the Court under Article

V, § 5 of the Constitution of the State of Texas is again invoked for resolution of another recurring confrontation between "Fair Trial" and "Free Press." Pressed upon us are vestiges of the common law and principles of federal and state constitutional provisions that we did not address in *Houston Chronicle Publishing Co., et al v. McMaster, Judge,* 598 S.W.2d 864 (Tex.Cr. App.1980) and the application of Article 1.24, V.A.C.C.P. that some of us did decide in that case.[1] Today, though we shall allude to efforts by the Supreme Court of the United States to reconcile First and Sixth Amendment provisions in, e.g., *Gannett v. DePasquale,* 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) and *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980), the decision we make is based on the constitutional and statutory law of the State of Texas, in a context of its meaningful historical setting.

When a people assert their independence of a national government and ordain and establish their own republic within two weeks, the rights they declare to be part of their constitution, "and shall never be violated on any pretence whatever," are more determinative of the kind of society being created than contemporaneous political statements urging its creation. In the Declaration of Rights contained in the Constitution of the Republic of Texas—just after guarantees of equal rights, an inalienable right of political power to alter government and freedom of religion—the Fourth enumeration is:

"Every citizen shall be at liberty to speak, write, or publish his opinions on any subject, being responsible for the abuse of that privilege. No law shall ever be passed to curtail the liberty of speech or of the press; . . . "[2]

And so it has ever been,[3] and still is declared in our Bill of Rights, Article I, § 8, viz:

"Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. * * * "[4]

The central idea embodied in the Constitution is simple: Express what one will, understanding one may be called to account for abusing the privilege. More expansively the Supreme Court of Texas explained in *Ex parte Tucker,* 110 Tex. 335, 220 S.W. 75 (1920), a classic statement of the proposition:

"The purpose of this provision is to preserve what we call 'liberty of speech' and 'the freedom of the press,' and at the same time hold all persons accountable to the law for the misuse of that liberty or freedom. * * * Punishment for the *abuse of the right, not prevention of its exercise,* is what the provision contemplates. * * *

The theory of the provision is that no man or set of men are to be found, so infallible in mind and character as to be clothed with an absolute authority of determining what other men may think, speak, write or publish; . . . and, therefore, that every person shall be left at

1. "Against the opposition of both parties and over the protest of Petitioners and without any proof of necessity, Respondent was not authorized to order closed the proceeding that the statute commands shall be open to the public." *Id.,* at 867.

2. 3 Vernon's Texas Constitution 535.

3. Constitution of 1845, Article I, § 5, 3 Vernon's Texas Constitution 544; Constitution of 1961, Article I, § 5, *id.,* at 574; Constitution of 1866, Article I, § 5, *id.,* at 602; Constitution of 1969, Article I, § 5, *id.,* at 640.

4. The next sentence had been added along the way: "In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence." That the truth of the matter published is a constitutionally provided defense in the instances prescribed is not without significance. See *Alsup v. State,* 91 Tex.Cr.R. 224, 238 S.W. 667 (1921), an aftermath of the 1920 political struggle between Pat Morris Neff and Joseph Weldon Bailey to be governor.

liberty to speak his mind on all subjects, and for the abuse of the privilege be responsible ... [according to law]."

Against that background of origin and understanding of how freedom of expression came to be so highly valued in Texas, we now state the factual developments giving rise to the proceeding before the Court. Since they are not in real dispute, and it is an accurate account, we draw heavily on the statement of the case presented by the Harris County District Attorney, representing the interests of respondent.

The present controversy arose during a capital murder trial which was conducted in the 262nd District Court, with respondent presiding. The capital murder defendant, Antonio Nathaniel Bonham, had been accused of the kidnapping, rape and murder of a teacher at a business college in Houston. Allegedly Bonham had killed the victim by running over her with her own automobile. The case received considerable publicity both immediately following the offense and at the time Bonham was brought to trial. See Texas Monthly, "The Lord's Work," January, 1982.

The Houston Chronicle Publishing Company, publisher of a daily newspaper called The Houston Chronicle (Chronicle), assigned reporter Jim B. Barlow to attend Bonham's trial and prepare reports on the proceedings for publication. The Houston Post Company, publisher of a daily newspaper called The Houston Post (Post), assigned reporter Mary Flood to cover Bonham's trial.

On October 20, 1981, the trial reached the point where the State sought to introduce Bonham's written confession. Pursuant to Article 38.22, § 6, V.A.C.C.P., and *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), it was necessary that the court conduct a hearing in the absence of the jury to determine whether the confession was voluntarily made. The jury was excused for the day. The *Jackson v. Denno* hearing proceeded until the State began introducing oral admissions by the defendant Bonham in order to show that the written confession was voluntary. Bonham's attorney then expressed concern that the jurors might hear or read media accounts of these oral admissions.[5] When it became known that this portion of the *Jackson v. Denno* hearing would be conducted in the judge's chambers, from which members of the public—including reporters Barlow and Flood—would be excluded, Barlow protested closure of the hearing and asked the court to delay its action until attorneys for the Chronicle could appear and present arguments against closure, but this request was refused. The *Jackson v. Denno* hearing was continued in camera, with the reporters and the general public excluded.[6]

Attorneys for the Chronicle arrived and protested the closure of the hearing, which at that point was a *fait accompli*. They

---

5. Counsel, urging that the State move on to testimony about reducing the statement to writing, explained that "since the other will not be admissible anyway" and the case "is being highly publicized," what the officer says about oral statements made by defendant "could possibly result in the ears of some of our jurors tonight or in the morning," stressing that the accused was only attacking the written statement. For its part the State was insisting that "it is important that the oral version of what happened be reported to the Court because it becomes relevant as to whether the written portion was voluntary," and represented that the testimony would show that as the written statement was being taken the accused often told the officer he did not want to put something or other in writing "because that would look bad." Then, realizing the State's position,

counsel opined, "If the Court wants to hear it, ... it would seem to me that would emphasize the voluntariness," that the officer was leaving something out. Then followed "[Discussion at the bench outside the hearing of the court reporter.]" after which respondent immediately announced that the matter would be pursued in chambers.

6. At the outset of the inchambers hearing respondent spread upon the record a summary of what had transpired, indicated that he was acting "in an abundance of caution" and obtained the personal agreement of Bonham to the closure. The prosecutor also stated his agreement with the procedure.

then demanded that respondent immediately release a transcript of the closed testimony; he stated that he would release such a transcript either after the jury returned a verdict of acquittal or, if Bonham were found guilty, after the jury retired to deliberate on the punishment.

Friday, October 23, Bonham was found guilty of capital murder. After the jury retired to deliberate on punishment, the following Monday, respondent caused the transcript of the closed portion of the *Jackson v. Denno* hearing to be read for the reporters.

Relators initially sought to obtain one or both of two kinds of relief: (1) the relators ask this Court to issue a writ of mandamus, directing respondent to vacate the order which closed the *Jackson v. Denno* hearing and to release a written transcript of the closed part of the hearing; (2) the relators ask this Court to issue a writ of prohibition, preventing respondent from closing any part of the proceedings in any future trials held in his court. But we were given to understand by representations at submission on oral argument that relators concede prohibition is not a proper remedy in the premises.

In common relators assert "rights" under Article I, § 8 and Article 1.24, supra, and the First and Fourteenth Amendments; the Chronicle alone adverts to guarantees of a "public trial" in Article I, § 10 of the Constitution of the State of Texas and in the Sixth Amendment. For his part, respondent relies heavily on the construction of the Sixth Amendment rendered by the Supreme Court of the United States in *Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979).

Were only the Sixth Amendment implicated, though *DePasquale* involved considerations attaching to a pretrial proceeding rather than, as here, a midtrial hearing,[7] we would be confronted with application of the dictum that "the Sixth Amendment confers the right to a public trial only upon a defendant and only in a criminal case," *id.*, at 387, 99 S.Ct. at 2909. That statement, of course, is what gave rise to the hue and cry from many court observers and legal commentators which, it is widely held, caused the Supreme Court to bring up and decide as it did *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980) less than one year later.[8] Be that as it may however, what the several opinions delivered in *Richmond Newspapers* determined is that "the right of the public and press to attend criminal *trials* is guaranteed under the United States Constitution," *id.*, at 558, 100 S.Ct. at 2816.[9] Again, what confronts this Court is a midtrial

---

**7.** In Part III of the Opinion of the Court Justice Stewart carefully points out that the Court is concerned with "special risks of unfairness" in publicity of "pretrial suppression hearings such as the one involved in the present case," and goes on to differentiate the actual trial, *viz*:

> "The danger of publicity concerning pretrial suppression hearings is particularly acute, because it may be difficult to measure with any degree of certainty the effects of such publicity on the fairness of the trial. After the commencement of the trial itself, inadmissible prejudicial information about a defendant can be kept from a jury by a variety of means. When such information is publicized during a pretrial proceeding, however, it may never be altogether kept from potential jurors. Closure of pretrial proceedings is often one of the most effective methods that a trial judge can employ to attempt to insure that the fairness of a trial will not be jeopardized by the dissemination of such informa-

tion throughout the community before the trial itself has even begun." *Id.*, at 378–380, 99 S.Ct. at 2904.

**8.** What Justice Blackmun characterizes as "resulting confusion" is documented in his Opinion Concurring in Judgment, *id.*, at 602, nn. 1 and 2, 100 S.Ct. at 2832, nn. 1 and 2.

**9.** Having thus framed "the narrow question presented," and after relating the facts of the matter, the opinion delivered by the Chief Justice went on to note that "the precise issue presented here has not previously been before this Court for decision" and to delineate *DePasquale* in that "the Court was not required to decide whether a right of access to *trials*, as distinguished from hearings of *pre*trial motions was constitutionally guaranteed," *id.*, at 564, 100 S.Ct. at 2821 (emphasis by Berger, C. J.). Rather, he explained, "here for the first time the Court is asked to decide whether a criminal

hearing, constitutionally mandated to be held outside the presence of the jury. *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). Thus, neither *DePasquale* nor *Richmond Newspapers* is directly controlling; still we may learn from their teachings.

"The problems presented by this case are almost as old as the Republic," *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 547, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976); *Richmond Newspapers*, supra, 448 U.S. at 564, 100 S.Ct. at 2821. They involve what has come to be called "a right of access" said to be guaranteed by the First and Fourteenth Amendments "to the public in general, or the press in particular," *DePasquale*, supra, 443 U.S. at 391–392, 99 S.Ct. at 2911; *Richmond Newspapers*, supra, 448 U.S. at 576, 100 S.Ct. at 2823. It is not to be confused with a "gag order" that amounts to "*prior* restraint on the press," [10] *DePasquale*, supra, 443 U.S. at 411, 99 S.Ct. at 2921. (Blackmun, J., dissenting); and see *Ex parte McCormick*, supra, at 106. In addressing the closure order issued by the habeas court in *Houston Chronicle Publishing Co. v. McMaster*, supra, we discussed two intertwining aspects of public policy considerations underlying such a right of access, and pointed out:

"... If the system failed McManus, it at once surely disserved the public. In demonstrating that failure before their very eyes, if he can, McManus will provide the public with some information on which to base adjustment or reform in the criminal justice system." *Id.*, at 866–867.[11]

However, just as the Chief Justice found in *Richmond Newspapers* that for good and valid policy considerations there has long been a "presumption of openness ... in the very nature of a criminal trial," we made no new discoveries in *Houston Chronicle Publishing Co. v. McMaster*. From similar considerations, the Court proclaimed more than seventy five years ago in *Ex parte Foster*, 44 Tex.Cr.R. 423, 71 S.W. 595 (1903):

"... Our constitution is but in accord with the genius and spirit of our free institutions, which is intended to guaranty publicity to the proceedings of our courts, and the greatest freedom in the discussion of the doings of such tribunals, consistent with truth and decency. And has been well said, 'When it is claimed that this right has been abridged, such claim must find its support, if any there be, in some limitation expressly imposed by the lawmaking power.' And this imposition must be in accord with the provisions of our constitution guarantying the publicity of trials, as well as the freedom of speech and of the press." *Id.*, at 595.

Similarly, in *Ex parte McCormick*, 129 Tex.Cr.R. 457, 88 S.W.2d 104 (1935), the Court

trial itself may be closed to the public on the unopposed request of a defendant, without any demonstration that closure is required to protect the defendant's superior right to a fair trial, or that some other overriding consideration requires closure." We are constrained to observe that much the same question was answered long ago in Texas by the Court, albeit in context of a contempt proceeding, in favor of the then publisher of the Chronicle. See *Ex parte Foster*, 44 Tex.Cr.R. 423, 71 S.W. 593 (1903); see also *Ex parte McCormick*, 129 Tex.Cr.R. 457, 88 S.W.2d 104 (1935), another contempt proceeding against reporters for the Chronicle, the Post and the Houston Press.

10. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

11. That throughout its evolution the criminal trial "has been open to all who cared to observe" is demonstrated in *Richmond Newspapers*, supra, 448 U.S. at 564–569, 100 S.Ct. at 2821–2823, and additional matters of public interest that they remain so are discussed therein, at 569–573, 100 S.Ct. at 2823–2825. From all that the Chief Justice opined that "we are bound to conclude that a presumption of openness inheres in the very nature of a criminal trial under our system of justice," *id.*, at 573. On the other hand, a general abhorrence of closed judicial proceedings was proved by the Supreme Court, through Justice Black, when it struck down statutory authorization of a "one-man grand jury" proceeding in private; on his way to finding a due process violation Justice Black wrote, "The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power," *In re Oliver*, 333 U.S. 257, 270, 68 S.Ct. 499, 506, 92 L.Ed. 682, 687 (1948).

reaffirmed *Ex parte Foster*, supra, and remarked, "In the nature of things, the proceedings of public trials constitute news which newspapers have the right to publish in informing the public of current events," *id.*, at 107. See also *Ex parte Craig*, 150 Tex.Cr.R. 598, 193 S.W.2d 178, 184 [12] (1946).

■ Article 1.24, V.A.C.C.P., was perceived in *Houston Chronicle Publishing Co. v. McMaster* to be a "positive statutory imperative," *id.*, at 866, and we now see that it is consistent with our forebearers' first Declaration of Rights, successive constitutional provisions and the considerations of significant public policies which have been surveyed. Indeed, the statutory command may itself be traced back through every code of criminal procedure to its genesis in 1856, Article 23 of the Old Code. Oldham & White, Digest of Laws of Texas (1859) at 570. Thus, Article 1.24 is a lasting expression of the legislative will to implement those rights and policies, so that a right of access to "proceedings and trials in all courts" in the public in general and the press in particular prevails.

Respondent, through the district attorney, concedes in his brief that a *Jackson v. Denno* hearing "certainly constitutes a 'proceeding' in a court and would therefore come within the ambit" of Article 1.24, supra. That hearing, it is to be recalled, was convened by respondent in open court, and the testifying officer was well into an account of his conversation with Bonham before the colloquy about the possibility that testimony of inadmissible oral remarks might reach the ears of some jurors overnight.

■ The action of the trial judge that followed—rising from the bench, retiring to chambers and conducting the remainder of the hearing in private—is the functional equivalent of closing the court to spectators and news reporters. It denied the right to access that our law ensures.[13]

"The right of the individual to publish his views on any subject cannot co-exist with the power to prevent him from doing so," *Ex parte McCormick*, supra, at 106. And, as in *Ex parte Foster*, supra,

---

**12.** "The right of the press to bring to public notice the acts, conduct and decisions of judges and courts and to comment freely and fairly thereon is not only its privilege but duty. There is nothing sacred about the courts or the judges thereof. They are open to criticism for their acts, as are all other officials. Such is the right guaranteed by our State and Federal Constitutions of freedom of the press and speech." But the Court also pointed out, "Liberty of the press and freedom of expression must not be confused with license or abuse of that liberty," and went on to find that the publications then at issue were properly held contemptuous. However, on writ of certiorari the Supreme Court of the United States reversed, and with respect to news articles, apart from an editorial, stated:

"We start with the news articles. A trial is a public event. What transpires in the court room is public property. * * * Those who see and hear what transpired can report it with impunity. There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."

*Craig v. Harney*, 331 U.S. 367, 374, 67 S.Ct. 1249, 1254, 91 L.Ed. 1546 (1947).

**13.** Respondent argues that it does not necessarily follow from *Houston Chronicle Co. v. McMaster* that Article 1.24 requires a *Jackson v. Denno* hearing be open. But the aspect of public policy identified by us there is not be taken so literally that, as he suggests, the length of time until the next session of the Legislature when one might advocate reform is of some moment. Nor is it controlling that Bonham, "the commonly presumed beneficiary of public proceedings in criminal matters," may be said to have waived operation of Article 1.24; certainly, he will not be permitted to waive the right of access belonging to others, as *Richmond Newspapers* clearly demonstrates. Finally, the assertion that the article should not be regarded "inflexible and absolute simply because it is a statute" is not well taken, for we have found that Article 1.24 is a legislative implementation of constitutional principles that the people of Texas have held immutable from the beginning. To be emphasized, however, is that though court proceedings shall be public there remain available to the trial judge "various tested alternatives," *Richmond Newspapers*, supra, 448 U.S. at 581, 100 S.Ct. at 2830, to protect the jury from outside influence, e.g., several listed and discussed in *Sheppard v. Maxwell*, 384 U.S. 333, 357–362, 86 S.Ct. 1507, 1519–1522, 16 L.Ed.2d 600 (1966).

"... We take it that the learned judge who exercised his authority [to order Foster that the court would hold him in contempt if his newspaper published testimony in the case at trial] did it, as he believed, in the interest of due administration of law; but the argument of convenience can have no weight as against those safeguards of the constitution which were intended by our fathers for the preservation of the rights and liberties of the citizen. And even if there was a conflict between the authority ... of the court, that should yield to the plain letter of the constitution." *Id.,* at 595–596.

Let two points never be overlooked, however.

First, our constitution has always insisted that the one who exercises the liberty to speak, write or publish on any subject is at once "responsible for the abuse of the privilege." *Ex parte McCormick,* supra, at 106; *Ex parte Tucker,* supra, at 76; *McMorries v. Hudson Sales Corp.,* 233 S.W.2d 938, 942 (Tex.Civ.App.—El Paso, 1950, no writ history). No doubt there are examples aplenty and others may be conjured up, but we merely point to what seem to be extreme abuses that the Court did not hesitate to condemn: *Ex parte Aldridge,* 169 Tex.Cr.R. 395, 334 S.W.2d 161 (1960) and *Ex parte Craig,* supra. Nor do we put down a threshold beyond which it may be said the privilege has been abused, but it is not asking too much to suggest that media "direct some effort to protect the rights of an accused to a fair trial by unbiased jurors," *Nebraska Press Assn. v. Stuart,* 427 U.S.

539, 560, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976).[14]

Second, the "possibility" voiced by attorney for Bonham, that inadmissible testimony may reach the senses of one or more jurors, always may be dealt with after the fact of becoming a reality. Here, the careful trial judge followed "the better practice" recognized in *Broussard v. State,* 505 S.W.2d 282, 284[15] (Tex.Cr.App.1974). There are remedies available to one convicted by jurors who are so prejudicially contaminated by media accounts that harm is a consequence. *Golden v. State,* 89 Tex.Cr.R. 525, 232 S.W. 813 (1921); see *Barrington v. State,* 594 S.W.2d 88, 90 (Tex.Cr.App.1980) and *Brown v. State,* 516 S.W.2d 145 (Tex. Cr.App.1974); see also *Haas v. State,* 498 S.W.2d 206, 211 (Tex.Cr.App.1973).

Finally, in this day of rapid communication a great amount of reporting the proceedings and trial of a criminal case presents "some risk that the publicity may compromise the right of the defendant to a fair trial," but in our adversary system of criminal justice the ultimate safeguard against prejudicial publicity is the right of the accused "to demonstrate that the media's coverage of his case—be it printed or broadcast—compromised the ability of the particular jury that heard the case to adjudicate fairly." *Chandler v. Florida,* 449 U.S. 560, 575, 101 S.Ct. 802, 810, 66 L.Ed.2d 740 (1981).

■ Thus, we find that this respondent was not authorized effectively to close out the public and media from the proceeding that our State law commands shall be

---

**14.** Earlier, in *Sheppard v. Maxwell,* supra, the Supreme Court spoke more sternly: "The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences," *id.,* at 363, 86 S.Ct. at 1522. There are statements to the same effect in its recently rendered opinion in *Chandler v. Florida,* supra, 449 U.S. at 574–565, 101 S.Ct. at 809: "Trial courts must be especially vigilant to guard against any impairment of the defendant's right to a verdict based solely upon the evidence and the relevant law." This Court, for its part, will continue to protect

the privilege to speak, write or publish on any subject, but also attach responsibility to abuse of that privilege. See in a context of "commercial speech," *Allen v. State,* 604 S.W.2d 191 (Tex.Cr.App.1980).

**15.** "While it is the better practice that the jury during a trial of the case be told not to listen to or view accounts of the trial, such becomes reversible error only when the accused is injured or prejudiced thereby. [citing cases.]"

open.[16] Article I, §§ 8 and 10; Article 1.24, all supra. Petitioners have shown themselves entitled to relief. *State ex rel. Vance v. Routt*, 571 S.W.2d 903 (Tex.Cr. App.1978); *Houston Chronicle Publishing Co. v. McMaster*, supra. We agree that in the premises the writ of mandamus, rather than writ of prohibition, is an available remedy. *Garcia v. Dial*, 596 S.W.2d 524, 529–530 (Tex.Cr.App.1980).

Accordingly, we grant the writ of mandamus directing respondent to set aside his closure order, though in the case at bar its objective has been accomplished. *Richmond Newspapers*, supra, 448 U.S. at 563, 580–581, 100 S.Ct. at 2820, 2830. However we are confident that respondent will act consonantly therewith, so the writ will issue only in the event of failure to comply with that which the Court directs.

W. C. DAVIS and McCORMICK, JJ., concur in result.

**16.** Thus, in the circumstances of this cause, we agree that subsequent "availability of a trial transcript is no substitute for a public presence at the trial itself," *Richmond Newspapers*, supra, 448 U.S. at 597, n. 22, 100 S.Ct. at 2839, n. 22 (Brennan, J., concurring in judgment).