David H. Donaldson, Jr., R. James George, Jr., Austin, for applicant.

Bill R. Turner, Dist. Atty., and Terrence Keel, Asst. Dist. Atty., Bryan, for respondent.

Robert Huttash, State's Atty., Austin, for the State.

**EAGLE PRINTING CO. d/b/a Bryan-College Station Eagle, Applicant,**

v.

**John DELANEY, Judge, 272nd Judicial District Court of Brazos County, Respondent.**

**No. 69288.**

Court of Criminal Appeals of Texas, En Banc.

May 30, 1984.

## OPINION

CLINTON, Judge.

A Court of Inquiry may be convened by any judge of a county or district court, acting in capacity as magistrate, who "has good cause to believe that an offense has been committed against the laws of this state." Article 52.01, V.A.C.C.P. This extraordinary proceeding arises from one convened by Respondent, and presents yet another instance of closing courtroom doors to, and withholding a record of ensuing proceedings from, the press. See *Houston Chronicle Publishing Company et al. v. Shaver, Judge,* 630 S.W.2d 927 (Tex.Cr.App.1982) and *Houston Chronicle Publishing Company et al. v. McMaster, Judge,* 598 S.W.2d 864 (Tex.Cr.App.1980).

Tuesday, May 8, 1984 Respondent opened a Court of Inquiry in order "to investigate allegations of aggravated promotion of prostitution and other crimes occurring at [two establishments] in Brazos County..." That he had "good cause to believe" the allegations is not an issue;[1] a

---

1. An ongoing investigation into prostitution had commenced in 1980, but, according to an investigator for Brazos County Sheriff's Department, not until "a citizen came forward and gave us information that we had not had previously" did it "lead to this court of inquiry." The citizen reported "his life had been threatened by one of the managers" of an establishment being investi-

court reporter was at her place and representatives of the media, including a reporter for the Bryan-College Station Eagle, were in the courtroom. Subpoenaed witnesses, fourteen in number we are told, were sworn and placed under the rule.[2]

Two female witnesses testified Tuesday, but what we know about the content of their testimony comes from an affidavit of Respondent and from recollections of a reporter who heard it and "impressions" given by the Sheriff's investigator during the course of a subsequent hearing. Each witness was granted immunity under Article 52.05 and testified, although Respondent characterizes the first as "uncooperative", his "belief" being that "she was deceptive, due in part to fear of retribution." The second witness "testified fully as to prostitution" at one of the establishments, but was "worried about the consequences of her testimony getting back to those people she worked with;" though the witness denied "any fear of her own," Respondent "felt she was either (1) lying about her fear (to avoid being accusatory) or (2) naive."[3]

While the second witness was still on the stand, the District Attorney approached representatives of the press then in attendance. He later testified that he "requested of them that they not print the name of *one* of the witnesses," saying "I realize I have no authority to do this, but I'm asking if you would." Wednesday's edition of the

Bryan-College Station Eagle carried a frontpage story under a headline reading:
"Court of Inquiry
2 women differ on existence of prostitution"
Both female witnesses are identified by name in the body of the article, as well as in a caption to a photograph of them handcuffed together on the way to court under escort of a uniformed jail supervisor. The story bears the byline of two staff writers, one of whom testified under questioning by the District Attorney that after the initial request:

"Q: Thereafter, we had several other discussions. And during those discussions, it was by the end of the day, it was my view that the public would probably, or *the people who wanted to know would probably, find out about it anyway?*[4]

A: That's true.

Q: Is that true, is that a fair assessment of how we left the conversation?

A: As a matter of fact, as I recollect, you actually said you didn't see any harm in using the names. And when I left, I left with the understanding that you no longer felt as you had earlier."[5]

So far as this record shows the judge himself did not enter into any of those discussions or make his own position known on Tuesday.

---

gated after he "had failed to pay for sexual services."

2. We gather that some subpoenas were served on persons found at one or the other establishment under investigation and that such activity was filmed by cameras of local electronic media after being tipped by the Sheriff's investigator. Although Respondent saw portions of the film on "the evening news" Tuesday, apparently he was unaware then that what he was viewing came courtesy of the Sheriff. The revelation resulted from his own questioning of a witness during a hearing the following day, Wednesday, May 9.

3. A reporter for Applicant was to testify that the second witness asked whether "what she said would be talked about with other witnesses," and was assured by the judge that "it would

not;" the witness also testified that "she did not feel threatened, had never been threatened" and, it seemed to the reporter, was "simply touchy about the matter that she did offer testimony against some of the people she worked with."

4. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

5. Later on in response to a question from the judge, this reporter said, "One of the reasons I had no trouble using the names in today's stories is because when I left the courthouse, I had just been told by the District Attorney that he no longer saw the harm in it."

However, Wednesday morning Respondent talked privately with the Sheriff's investigator and the District Attorney, explaining "my concerns about the girl's life," and receiving "assurances" from the former that "steps would be taken to protect the witness."[6] The District Attorney told the judge that for his part "he had believed it was best that he withdraw his request [of the press not to print her name] and trust that the press would exercise some discretion." Then Respondent recounts in his affidavit the following developments:

"Before the Court of Inquiry resumed on May 9, 1984, I questioned members of the press about their intentions of printing names of witnesses. After expressing my concerns for the lives of the witnesses, ... a reporter for the *Eagle*, said that the proceeding was an open proceeding and that she would use the same judgment as used the day before as to whether or not she would print the names of the witnesses. She further stated that she did not feel responsible for any harm that came to the witnesses.

Based on a fear I had for the lives of the witnesses who were to testify on May 9, 1984, as well as the potential chilling effect the media's presence would have on future witnesses, I told the media, including the *Eagle*, to leave the courtroom. Such action was taken to insure the safety of the lives of the witnesses of the Court of Inquiry as well as to achieve the purpose of the Court of Inquiry. The press then exited the courtroom and I continued to conduct the Court of Inquiry."

Thereafter, but still on Wednesday, Applicant filed a motion to set aside the oral order rendered by the judge, and an immediate hearing was held at which Applicant's reporter, the District Attorney and the Sheriff's investigator testified, and to which reference has been made from time to time in this opinion. The motion to set aside was denied by the judge upon his finding:

"It is going to be necessary to exclude that limited portion of the public [consisting of members of the print and electronic media] from these proceedings in order to try, number one, to add some small degree of protection for the benefit of the witnesses; and, number two, try to improve or enhance the effectiveness of the proceeding by avoiding the chilling effect that the court perceived media attention to it would have."[7]

May 10, 1984, upon consideration of a motion for leave to file by Applicant this Court granted the motion, stayed the Court of Inquiry proceedings until further order and set a date for Respondent to respond to the application. Meanwhile Applicant had requested but had not obtained a transcription of the notes taken by the court reporter during the Court of Inquiry proceedings; accordingly it presented a supplemental application and we directed Respondent to respond to that matter as well.[8] The cause was submitted on briefs and oral argument May 23, 1984 and after

---

**6.** Subsequently, the investigator was asked by an assistant district attorney what steps had been taken to insure safety of the second witness, but his answer was interrupted by the judge's query about "put[ting] this on public record," and the question was withdrawn. Nevertheless, the investigator testified that steps had been taken.

**7.** The judge added:

"The court could have taken the tact, or conceivably might have taken the tact, of banning all members of the public. Chose not to do that because the Court saw the potential harm was flowing only from the activities of the electronic and print media.

.There is a balancing that must take place, in my judgment in fair trial. This was not a trial. Defendants have remedies. In proceedings like courts of inquiry, which are analogous to Grand Jury proceedings, the witnesses don't always have remedies.

That's all."

**8.** By a second affidavit Respondent states that his decision is to grant the request of Applicant "upon completion of testimony in any trial of criminal charges that may grow out of the Court of Inquiry, or within one (1) year after May 9, 1984, whichever occurs first."

due deliberation we have concluded that Applicant is entitled to relief.

Under prior codes of criminal procedure authority to conduct such an inquiry and to extract testimony from persons was in justices of the peace. See, e.g., Article 886 [9] and 887,[10] C.C.P. 1925. There was no express provision as to "whether the investigation shall be public or secret," *McClelland v. Briscoe,* 359 S.W.2d 635, 638 (Tex. Civ.App.—Houston 1962, writ ref'd n.r.e.). However, conventional wisdom held the statute permitted "a public ex parte proceeding," *ibid.,* and reported cases demonstrate that usually much publicity was engendered. See, e.g., *McClelland v. Briscoe,* supra, at 640 [11] (Coleman, J., concurring); *McClelland v. Briscoe,* 359 S.W.2d 640, 642 [12] (Tex.Civ.App.—Houston 1962, writ ref'd n.r.d); *Ex parte Smith,* 383 S.W.2d 401, 402 [13] (Tex.Cr.App.1964). Procedures sometimes employed were found so "shocking" and "essentially unfair," *McClelland,* supra, at 638, 640, "due to the arbitrary and prejudicial abuse" of the statute, *Ex parte Smith,* supra, 403, that the segments of judiciary called for legislative relief. *McClelland,* supra, at 638,[14] 640; *Martin v. State,* 395 S.W.2d 631, 635–636 (Tex.Cr.App.1965); see also *Ex parte Smith,* supra.

The Legislature soon responded with Chapter Fifty Two, V.A.C.C.P., concluding (contrary to a recommendation by the State Bar Committee) that a Court of Inquiry "might still be useful if limited to district courts [15] with the procedure spelled out providing for the taking of testimony, rights of witnesses, stenographic records, *public hearings,* etc." in Article 52.02 through 52.09. Special Commentary following Article 52.01.

Remedial measures were taken. There are provisions for taking evidence by deposition or affidavit and allowing an affected party to object. Article 52.02. Rights of witnesses are delineated in Article 52.04, but under Article 52.05 any person "may be compelled to give testimony or produce evidence when legally called upon to do so at any Court of Inquiry." A person may invoke the privilege against self incrimination, but the judge may nevertheless compel one to testify or produce evidence under protection of what amounts to a statutory grant of immunity from prosecution, Article 52.05, and one who still refuses to comply may be, as always, punished by fine and attached and confined until he does testify. Article 52.06. Like before, when testimony and evidence makes it appear that an offense has been committed the

**9.** A justice of the peace with good cause to believe that an offense had been committed was empowered to "summon and examine any witness in relation thereto;" should a witness make it appear that an offense had been committed, the justice was to reduce the testimony to writing, have it sworn to and issue a warrant to arrest the offender, as if a complaint had been made and filed.

**10.** Witnesses who refused to make a statement under oath were guilty of contempt, subject to a fine of one hundred dollars and being "attached and imprisoned until they make a statement."

**11.** "In this age of mass communication the testimony developed at a court of inquiry is immediately made known to all prospective jurors. * * It may reasonably be argued that by reason of the publicity engendered by a court of inquiry, evidence is procured which might not be discovered by a secret investigation."

For additional views on "important constitutional questions" presented in a challenge to the court of inquiry investigating the *McClelland*

affair, and the publicity that attended it, see *Martin v. Beto,* 397 F.2d 741 (CA5 1968).

**12.** "The Court of Inquiry was public and was covered by television, radio, photographers and the press."

**13.** "Further, all the proceedings were conducted in public, in a crowded courtroom and present throughout the proceedings were television cameramen, newspaper reporters and photographers."

**14.** The Houston Court of Civil Appeals also suggested that the Supreme Court might provide relief by reexamining its decision upholding a similar procedure authorized by V.A.C.S. Election Code, Article 9.02, in *Ex parte Jimenez,* 317 S.W.2d 189 (Tex.Cr.App.1958). However, it appears that legislative response made that suggestion moot.

**15.** Initially only a judge of a district court was authorized to conduct a Court of Inquiry, but two years later judges of county courts were included. See Historical Note to Article 52.01.

judge "shall issue a warrant for the arrest of the offender as if complaint had been made and filed," Article 52.08.

The Legislature obviously believed that important public interests are served by such a properly conducted proceeding. We notice particularly that past practice of allowing the press unfettered access to proceedings of a Court of Inquiry and to the record made by it was expressly legislated.[16] Thus Article 52.07 mandates:

"All evidence at a Court of Inquiry *shall* be transcribed by the court reporter and all proceedings *shall* be open to the public."

Respondent, through the District Attorney representing him, argues that in the decided Federal cases "there is a central theme of balancing interests of the press versus those of the administration of justice," and he points to several Texas cases and other authorities—many of which are collected in *Price v. State*, 496 S.W.2d 103 (Tex.Cr.App.1973)—for the proposition that it is within the sound discretion of the trial judge in a criminal action "to decide on the exigencies of the occasion," *id.*, at 108. As we view it, a "balancing theme" is to reconcile tensions between rights under the First and Sixth Amendments, as explicated in *Houston Chronicle Publishing Co. v. Shaver*, supra, at 630, and simply states considerations for exercise of discretion by the trial judge. But in criminal actions this Court has ascertained that Article 1.24 is "a lasting expression of the legislative will

... that a right of access to 'proceedings and trial in all courts' in the public in general and the press in particular prevails," *id.*, at 932.[17]

In the instant cause we do not confront competing constitutional rights—only Applicant claims guarantees under the First Amendment and Article I, § 8, Texas Bill of Rights, and there is no accused before the Court to assert protections under the Sixth Amendment and Article I, § 10, supra, or any other provisions. In such circumstances if "interests of the press versus those of the administration of justice" are to be balanced, it occurs to us that the Legislature already struck that balance in 1965 by enacting Chapter Fifty Two. To the Legislature may be attributed knowledge and understanding of contemporaneous uses and abuses of Courts of Inquiry so recently criticized, see *supra*, at p. 6–7, and we have no reasoned basis for concluding that the Legislature did not mean literally that which it plainly and clearly stated in Article 52.07.

The command that all proceedings of a Court of Inquiry "shall be open to the public" includes the press. See *Houston Chronicle Publishing Company v. Shaver*, supra, and *Houston Chronicle Publishing Company v. McMaster*, supra; see also *Ex parte Foster*, supra. Ad hoc differentiations are not contemplated by the statute. Without denigrating the concerns expressed by Respondent we find they do not militate against the statutory impera-

16. Though there were no counterparts in former codes, predecessors to Article 1.24, V.A.C.C.P., required that "proceedings ... in all courts shall be public." We have found that is a legislative implementation of constitutional guarantees of free institutions of government and of freedom of speech, press and other expression. *Houston Chronicle Publishing Co. v. Shaver*, supra, cast as "a positive statutory imperative," *Houston Chronicle Publishing Co. v. McMaster*, supra, at 866. Early on, the statement of a witness reduced to writing and sworn to was held to be "a public document" in *Jenkins v. State*, 45 Tex.Cr.R. 173, 75 S.W. 312 (1903).

17. In this connection we observe that while the trial judge in *Price*, supra, did close the court-

room to lay spectators while the distraught rape victim testified he pointedly permitted a representative of the press to remain throughout. See *Price*, at 107.

The State also excerpts from *Ex parte Foster*, 44 Tex.Cr.R. 423, 71 S.W. 593 (1903) a portion of the discussion by the Court in *State v. Galloway*, 5 Cold. 326, 98 Am Dec. 404, without recognizing that the Court went on to say that the quoted statement "was not necessary to that decision," *id.*, S.W. at 595. Indeed, the actual holding of the *Foster* Court contributed to support the conclusion of this in *Shaver*, supra; that is, "We accordingly hold that the court had *no power* to prohibit the publication of the testimony of the witnesses in the case...," *id.*, S.W. at 596.

tive laid down by Article 52.07.[18]  So long as the proceedings were closed to the press, they were not open to the public.

Thus, we find that this Respondent was not authorized effectively to close out the press from the proceeding that our State law commands shall be open.   Article I, § 8; Article 52.07.   Subsequent availability of a transcript of the proceedings conducted during closure is no substitute for public presence during the proceedings.  *Shaver*, supra, at 934, n. 16.   But with respect to proceedings of the Court of Inquiry May 9, 1984, the just remedy is to make such a transcript available to Applicant.

Accordingly, we grant the writ of mandamus directing Respondent to set aside his closure order and decision to withhold availability of a transcription of proceedings held May 9, 1984.   However, confident that Respondent will act as we have indicated, the writ will not actually issue unless there is a failure to comply with that which the Court directs.

---

**18.**  "The safety or life of the witness or a party to an action is the responsibility of law enforcement agencies.   It is not properly done by courts through the use of secrecy orders.   Once the argument to the contrary is accepted, any vitality in an open judicial system is destroyed."  *Seattle Times Co. v. Ishikawa,* 97 Wash.2d 30, 640 P.2d 716, 724–725 (1982).